THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THEODORE BACON, Defendant-Appellant.

First District (4th Division)   No. 80-4

Opinion filed December 23, 1980.

---

Jenner & Block, of Chicago (Michael B. Brohman, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Mark A. Graf, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Theodore Bacon, was found guilty of the murder of Josie Brown. His motion for a new trial was denied. He was sentenced to a term of 40 to 80 years imprisonment. The defendant appeals from the denial of his motion to dismiss the indictment and from his conviction contending: (1) the trial judge erred in refusing a voluntary manslaughter instruction because there is evidence in the record which, if believed by the jury, would support a finding of voluntary manslaughter rather than murder; (2) the grand jury indictment against the defendant is defective because the State failed to produce exculpatory evidence; (3) the trial judge erred

in permitting a State's witness to testify about a prior altercation between the defendant and the victim; (4) the trial judge erred in allowing the State to elicit testimony regarding a baseball bat where the admission of the evidence served no purpose other than to prejudice the rights of the defendant.

At trial, Minnie Tucker, the victim's sister, testified that she last saw Josie Brown alive at about midnight on Tuesday, April 13, 1976. The victim had been visiting the witness at the witness' house. The victim called the defendant on the telephone. The victim then called a cab to go home.

The following day, Tucker went to 4100 West Madison Street to meet the victim to go shopping. When the victim failed to appear, Tucker went home and called the apartment shared by the victim and the defendant. There was no answer. On April 15, 1976, Tucker visited the apartment shared by the victim and the defendant. No one was home. Tucker asked a man at the apartment building to have the defendant call her when he returned. The defendant subsequently called Tucker. He stated he did not know where the victim was, and he denied having talked to the victim on Tuesday, April 13. On April 16, Tucker filed a missing persons report with the police. She next saw her sister on the following Monday at the Cook County Morgue.

Dennis Calloway testified that he lived in the same apartment building as did the defendant and the victim in April of 1976. He had known the defendant for about a year and a half at that time. He and the defendant were friends. On April 18, 1976, the defendant told Calloway that he, the defendant, had killed the victim. The defendant stated that he had not meant to kill her.

Assistant State's Attorney Jeffrey Singer read into evidence a typewritten statement given by the defendant. In the statement, the defendant stated that the victim entered the apartment late on April 14, 1976. He and the victim got into an argument over her use of drugs. They started "passing licks." The defendant struck her with his hand six or seven times. While the defendant was hitting the victim, she was asking him to stop hitting her. The victim tried to run out of the apartment but the defendant pulled her back inside. As the defendant was pulling the victim back into the apartment, she was asking him not to hit her anymore. The victim threw some objects at the defendant, but he avoided being hit by them. The defendant stated that these objects were not deadly. The defendant then struck the victim. She fell, hitting her head on the television. The defendant picked her up and sat her on the couch. He poured water on her face, and noted that she was breathing loudly. Her face was bleeding slightly over her left eyebrow. That morning, the defendant wrapped her body in a rug and put it behind a couch in the apartment. Three days later

he carried the victim's body out of the building and put it into the trunk of his car. He drove around for two or three hours. Eventually he placed the victim's body under a bridge. As a result of the fight the defendant sustained scratches on his wrist and forearm.

Chicago Police Officer Kunz testified as to a conversation he had with the defendant during the ride to Chicago from Florida, where the defendant was arrested. The defendant told Kunz that he had killed the victim during a fight, at which time he had punched her six or seven times. He stated that the victim fell, striking her head on the television set.

Yuksel Konakci, an assistant medical examiner, testified that on April 20, 1976, he conducted an autopsy on the body of the victim. He observed a laceration on the left side of the victim's face, starting from the left eyebrow and going to the forehead. There was another laceration on the right side of the head. This was a one inch cut behind the right ear. On the chest area he observed an abrasion and several smaller abrasions. There were two areas of bruising on the right side of the abdomen. On the left side of the abdomen there was an abrasion. There were abrasions on the right flank and the right leg. There was a bruise on the right thigh. On the left side of the back, in the upper middle and lower levels, there were four superficial incisions. There was another superficial incision on the right side of the back. There were four large abrasions on the upper back.

Dr. Konakci also did an internal examination of the head of the victim. This examination revealed several hemorrhages on the rear occipital region of the brain. An internal examination of the body of the victim was conducted. Dr. Konakci testified that his examination revealed hemorrhages on the internal surface of the left chest cavity.

The doctor stated that the victim died of cranial-cerebral injury. He explained this to mean that she died of injuries to the head and brain.

The defendant testified on his own behalf. He stated that he had met the victim in 1972 and had begun living with her toward the end of 1975. At about noon on April 13, 1976, the victim left the apartment to visit her sisters on the south side. At about midnight, the defendant went to the elevated station to meet the victim. He returned to the apartment after the victim failed to appear.

The victim returned to the apartment at about 2 or 3 o'clock in the morning of April 14, 1976. An argument ensued between the defendant and the victim over his plans to visit Florida. The defendant and the victim began arguing. They "passed licks." The victim stumbled and fell on the television set. The defendant told her to get up. She responded that she had hurt her head. He helped her onto the couch and suggested she see a doctor. The victim refused. The defendant got the victim a glass of water. She knocked the glass out of his hand. They talked for a short time. The victim stated she wanted to go back to the south side. The defendant

then went into the bathroom to take a bath. He heard the victim throwing things around, and then heard a door slam. When the defendant came out of the bathroom, the victim was gone.

The defendant attempted to locate the victim for two days. On Friday, April 16, 1976, after failing to locate the victim, the defendant left for Florida.

On cross-examination the defendant testified that when the victim returned to the apartment they began to discuss his planned trip to Florida. She wanted to accompany him on this vacation, but he stated that he needed time to spend with his children. He offered to drive the victim to Arkansas so she could visit with her family while he was in Florida. After a while the victim got angry. She slapped the defendant in the face. The defendant slapped her back. They "passed licks." The defendant hit the victim three of four times. She threw some things at the defendant, but he avoided being hit. The victim then grabbed the front of the defendant's clothes. He pushed her away with both of his hands. The victim then slapped the defendant in the face again. She turned and fell, hitting her head on the TV set or the TV table. There was a small cut on the victim's forehead, but the cut did not bleed. The victim sat on the couch. She said her head hurt and that she wanted to return to her sister's house on the south side. While the defendant was taking a bath the victim left the apartment.

The defendant denied making a statement to Assistant State's Attorney Singer. He read the typewritten statement, and denied that he had given any of the answers contained therein.

During cross-examination at trial and in his written statement, the defendant stated that at the time of the incident the defendant was 5′ 11″ and weighed 165 pounds. The victim was 5′ 2″. There was no evidence as to her weight.

Janie Shaw, who lived in the apartment next to the one shared by the defendant and the victim, testified at trial. She stated that at about 1 a.m. on April 14, 1976, she heard the sound of things bumping up against the wall between her apartment and that of the defendant and victim. She heard a man and a woman cussing at one another. She heard the woman state "Theodore, please don't hit me no more." The noises continued until about 2:30 a.m.

Nellie Brown lived one floor above the apartment shared by the defendant and the victim. At about 12:30 or 1 o'clock in the morning of April 14, 1976, she heard the defendant ask the victim in an angry voice "why wasn't you at the el station?" She heard the defendant and the victim begin fighting. Thereafter she heard "licks being passed," by which she meant that she heard "hits with the hand," and "punching sounds." The noises continued for about 1½ hours. Throughout this entire

1½-hour period, she heard the victim repeating "Theodore, please quit. Theodore, Theodore leave me alone." The victim repeated this over and over. The witness then heard a banging sound as if someone was throwing someone against the wall. The witness tried to call the police. She reached a telephone operator. She asked the operator to call the police because "a man and a woman was downstairs fighting and I didn't know whether he was hurting her or not."

At the close of the trial, counsel for the defendant tendered a voluntary manslaughter instruction. The trial judge refused the instruction on the State's objection.

The defendant first contends that the trial court improperly refused to give the voluntary manslaughter instruction. It is well settled that it is reversible error to refuse a requested manslaughter instruction where there is any evidence in the record which, if believed by a jury, would reduce the crime from murder to manslaughter. (*People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358; *People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131.) However, it is equally well settled that such instruction should not be given if the evidence clearly demonstrates that the crime was murder and there is no evidence to support a conviction of manslaughter. *Handley.*

Section 9—2(a) of the Illinois Criminal Code (Ill. Rev. Stat. 1975, ch. 38, par. 9—2(a)) provides in part:

"A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) The individual killed or

(2) * * *.

Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

Mutual combat has been recognized as one of the categories of serious provocation. *People v. Hammock* (1979), 68 Ill. App. 3d 34, 385 N.E.2d 796; *People v. Free* (1976), 37 Ill. App. 3d 1050, 347 N.E.2d 505.

The defendant refers only to the testimony of Shaw and Brown and to his own written statement in arguing that the record contains evidence of mutual combat which, if believed by the jury, would reduce the charge from murder to manslaughter. Shaw's testimony was that she heard a man and a woman cussing at each other and heard the woman state, "Theodore, please don't hit me no more." Brown testified that she heard licks being passed and that for 1½ hours she heard the victim repeating "Theodore, please quit. Theodore, leave me alone." She tried to call the police because a man and a woman were fighting and she didn't know whether

the man was hurting the woman or not. This evidence refutes rather than supports the defendant's claim that at the time of the killing he and the victim were engaged in mutual combat.

The defendant's written statement further refutes his claim of mutual combat. According to this statement, the victim had "passed licks" with the defendant and had thrown objects, which were not deadly, at the defendant. However, in describing the incident the defendant stated that while he was hitting the victim she was asking him to stop. The victim tried to run out of the apartment but the defendant pulled her back inside.

■■ We do not believe that the victim's actions could possibly be considered "serious provocation" for the extensive beating she received. The altercation between the defendant and the victim, as described by the neighbors and in the defendant's written statement, could not be considered mutual combat. We concur with the trial judge's determination, in refusing to give the tendered manslaughter instruction, that there was no evidence in the record from which the jury could have found the defendant guilty of manslaughter.

*People v. Wesley* (1978), 65 Ill. App. 3d 25, 382 N.E.2d 358, cited by the defendant, turned on the fact that it is recognized in law that the breakup of a marital-type relationship is the kind of situation which can give rise to sudden and intense passion. Because there was evidence in the record that the defendant had been fighting with his "common-law wife" over the breakup of their marital-type relationship, the appellate court refused to reverse the jury's determination that the defendant had been acting under a sudden and intense passion resulting from serious provocation. Here there was no evidence that the defendant and the victim were engaged in combat over the breakup of a marital-type relationship. Neither does the defendant contend that their argument was of the type which is recognized to incite sudden and intense passions. We therefore do not believe that the *Wesley* decision is dispositive here.

The other cases cited by the defendant are also inapplicable. In *People v. Stowers* (1971), 133 Ill. App. 2d 627, 673 N.E.2d 493, there was evidence that the victim had initiated the confrontation resulting in his death by throwing a can at the defendant causing a head wound which required stitches. The appellate court refused to reverse the jury's determination that the victim's conduct constituted serious provocation. In *People v. Hammock* (1979), 68 Ill. App. 3d 34, 385 N.E.2d 796, the victim and the defendant had been fighting over the breakup of their marriage. The victim had subjected the defendant to more than two hours of verbal and physical abuse and had threatened to kill her. On the basis of this evidence the appellate court affirmed the defendant's manslaughter conviction.

The defendant next contends that the grand jury indictment against him must be dismissed because the State deliberately withheld evidence from the grand jury which tended to exculpate him. The defendant was originally charged by information with murder. At the preliminary hearing on this charge the substance of his written statement was entered into evidence. The preliminary hearing judge made a finding of probable cause as to the lesser included offense of voluntary manslaughter but did not find probable cause as to murder. Thereafter, the State appeared before the grand jury of Cook County seeking a murder indictment against the defendant. The defendant's statement was not introduced at the grand jury proceeding. Rather, the State offered only the testimony of the police officer who had participated in the arrest of the defendant. He related facts of the defendant's arrest and testified that the defendant told him that he struck the victim several times killing her, and that he had disposed of her body. The defendant was indicted for murder.

The defendant's first contention concerning this issue is that his indictment must be quashed because the State failed to disclose to the grand jury that a judge had previously found probable cause only as to involuntary manslaughter. However, this argument is foreclosed by the supreme court's decision in *People v. Creque* (1978), 72 Ill. 2d 515, 382 N.E.2d 793. In *Creque* the trial court dismissed an indictment for attempt murder in part because the State did not inform the grand jury that a judge had previously found no probable cause as to attempt murder and found probable cause as to aggravated battery. The supreme court held that the State is not required to inform the grand jurors of preliminary findings of probable cause or no probable cause.

The defendant's next argument is that his indictment must be quashed because the evidence of mutual combat contained in his written statement was not presented to the grand jury. Based upon our determination that the written statement contained no evidence of mutual combat, we find no merit in this argument.

The defendant next contends that the trial court erred in permitting Nellie Brown to testify about a prior altercation between the defendant and the victim. Over the objection of defense counsel, Nellie Brown testified that in February of 1976, she visited the apartment then shared by the defendant and the victim. The defendant entered the bathroom of the apartment and called the victim. When the victim went into the bathroom, the defendant grabbed the back of her neck and attempted to push her head into the toilet. The victim was straining to keep her head out of the toilet. She asked the defendant to stop. The defendant stopped. The victim then returned to the dining room of the apartment, crying.

Evidence of prior crimes or acts by the defendant are not admissible

to show his propensity to commit a crime. (*People v. Lehman* (1955), 5 Ill. 2d 337, 125 N.E.2d 506.) However, evidence which tends to show motive, intent, identity, absence of mistake, a common scheme or plan or *modus operandi* is admissible even if it also shows the commission of a separate offense. *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.

The State contends that Nellie Brown's testimony was admissible to show the defendant's attitude or state of mind toward the victim. However, the three cases cited by the State in support of this proposition are distinguishable from the instant case. In *Painter v. People* (1893), 147 Ill. 444, and *Parsons v. People* (1905), 218 Ill. 386, evidence of prior altercations between the defendants and the victims were admitted only after the courts found that the defendants had frequently committed bad acts against the deceased or had continually demonstrated a certain attitude toward the deceased. Here, there is evidence of a single "bad act" by the defendant against the deceased.

■■ In the third case cited by the State, *People v. Smythe* (1971), 132 Ill. App. 2d 685, 270 N.E.2d 431, the defendant was convicted of the murder of his wife. He testified at trial that his wife had been the aggressor in the knife fight which resulted in her death. The victim's mother was allowed to testify that 11 months prior to the victim's death, the defendant had called the witness on the telephone and told her that he had knocked down a man walking with his wife. The defendant then told the witness that he had tried to cut the victim's throat and had left her for dead. The victim's mother testified that as she was talking to the defendant, the victim walked into the mother's apartment. The victim's neck was bleeding. The court held that the mother's testimony was admissible because it was relevant to the defendant's attitude toward his wife and to whether the defendant was the aggressor. We do not believe that the incident described by Nellie Brown was sufficiently relevant to the defendant's attitude toward the victim to warrant its admission into evidence. In *Smythe*, the defendant was accused of stabbing his wife to death. The testimony concerning the prior altercation was that the defendant had stabbed his wife and left her for dead. Here, there is no such similarity between the incident described by Nellie Brown and the incident which resulted in the victim's death.

■■ However, this finding does not require automatic reversal of the defendant's conviction. Where erroneously admitted evidence does not prove any element of the crime not established by other properly admitted evidence, then the error in admitting such evidence does not contribute to the finding of guilt and is harmless. (*People v. Kavinsky* (1980), 91 Ill. App. 3d 784, 414 N.E.2d 1206; *People v. Landgham* (1970), 122 Ill. App. 9, 257 N.E.2d 484, *appeal denied* (1970), 44 Ill. 2d 585,

*cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 652, 91 S. Ct. 1389. Here, every element of the crime was established by properly admitted evidence, and the defendant does not argue otherwise. We therefore do not reverse the defendant's conviction on the basis of the trial court's failure to exclude Nellie Brown's testimony as to the prior altercation between the defendant and the victim.

The defendant next contends that the trial court committed reversible error in allowing the State to elicit testimony concerning a baseball bat which was found in the defendant's car. He argues that the State was permitted to create the false inference that the bat was used as a murder weapon although the bat was not shown to be linked to the offense charged and was irrelevant for any purpose.

Chicago Police Officer Harold Kunz testified that he obtained a search warrant for the defendant's car. The car was recovered on April 20, 1976. Kunz identified two photographs as depicting the inside of the trunk of the car. When asked whether the photographs truly and accurately depicted the condition of the trunk as it was on April 20, 1976, the witness answered that it did "with certain exceptions." He stated that the picture was taken after Kunz removed a vinyl clothing bag, part of a plastic polyethylene bag, a pair of gloves and a baseball bat. These were removed from the trunk and inventoried by the police department because they had "red stains" on them. Kunz identified the vinyl clothing bag in court. He expressed the opinion that the red stains on the bag were blood. Kunz then identified the piece of the plastic bag and expressed the opinion that the red stains on the plastic bag were blood. The witness then identified the gloves and baseball bat as being the items which he removed from the defendant's car.

■■ First, the defendant made no objection at trial to Kunz' testimony regarding the baseball bat. Therefore, he has waived any error which may have arisen from the admission of such testimony. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) Second, the record does not support the defendant's contention that Kunz' testimony created the false inference that the bat was used as a murder weapon. No evidence adduced at trial remotely suggests that the defendant ever struck the victim with a bat. Rather, all the evidence was that the defendant beat the victim with his hands. The witness had testified that the photograph of the defendant's trunk did not accurately depict the trunk at the time it was opened because four items had been removed prior to the time that the photograph was taken. It appears that Kunz' brief testimony concerning the gloves and baseball bat was elicited for the purpose of accounting for all the items referred to.

The defendant also contends that the State walked to the witness stand with the bat, "making sure it was in plain view of the jury," and that

the bat remained before the jury until the questioning was complete. We find nothing in the record to support this contention and therefore do not consider it.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

LINN, P. J., and JOHNSON, J., concur.