THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PHILLIP WALLACE, Defendant-Appellant.

First District (5th Division)   No. 81—1107

Opinion filed April 15, 1983.

Kenneth L. Jones and Scott Szala, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Jeanette Sublett, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

After defendant was convicted by a jury of murder, armed robbery, and home invasion, he was sentenced to life imprisonment.[1] On appeal, he contends that the trial court erred in (1) denying his motion to suppress his written statement; (2) failing to excise from his written statement a reference to his alleged sale of narcotics; (3) denying his motion for a mistrial after a State's witness testified to his presence in jail; and (4) permitting his impeachment on a collateral issue involving his bond forfeiture in an unrelated case.

There is no contention that guilt was not established beyond a

---

[1]Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1.

reasonable doubt, and we will therefore discuss only the testimony bearing upon the issues presented. At the hearing on defendant's motion to suppress his written statement on the ground that it was not voluntarily given, Assistant State's Attorney Neville testified that defendant was advised of his constitutional rights and then gave the statement to him at 2:50 p.m. on October 1, 1980, in the presence of Officer Pochardo and a court reporter at police headquarters; that after the statement was typed, defendant read it, initialed every page, and signed the last page; that in his presence there were no promises or threats made to defendant, and no one struck him; and that defendant had given a prior oral statement to him which was substantially the same as the written statement.

Defendant testified in substance that he was in Birmingham, Alabama, on September 30, 1980, when Chicago police officers Hood and Pochardo informed him they had an arrest warrant against him for murder; that the next day, on the way to Chicago, Pochardo told him the details of the murder and, although he told the officers that he had no knowledge of it, Pochardo said that the State would seek the death penalty if he would not cooperate; that no *Miranda* warnings were given him by the police officers, but they were given by the assistant State's Attorney prior to the oral and written statements given to him; and that he made these statements because he was scared and trying to protect himself.

Officers Hood and Pochardo both stated that when they first saw defendant, in Birmingham, he was advised of his constitutional rights; however, they both admitted the police report did not so state. They also testified that he never asked for a lawyer and that no threats or promises were made at any time to him. Hood also stated that he may have told defendant that they had statements from Larry Wiggins and Webber Dowells which implicated someone named "Bull" in the shooting, but that he did not say that either of them had named defendant as the person doing the shooting.

The motion to suppress was denied and, at trial, a Chicago police officer testified that in his investigation of the shooting of a woman on June 21, 1979, he found the body of Wilhemina Wade lying in the hallway of the first-floor apartment at 5021 Indiana Avenue. He also noticed that dresser drawers in her apartment had been removed and their contents strewn about. While the officer was in the apartment, Anthony Harris came in and told him of seeing two men involved in the shooting. Harris gave a description of them and said one had the nickname "Bull."

Harris, age 13 at the time of the shooting, then testified that he

was in the rear yard of the building helping Wade clean up her yard when three men approached the gate from the alley. One man walked on through the gate, and she stopped the other two who said that they were going to see someone on the second floor. She told the latter two to ring the front bell. Shortly thereafter, the two men returned to the yard, and he heard one of them call into the house for "Bull." He (Harris) was then standing on the porch next to the back door of Wade's apartment, and a man he identified as defendant came out of the apartment, pointed a gun at him, and told him to come in. Defendant was pulling him into the apartment when Wade told defendant to get out of the house. Defendant then shot her twice, and she fell to the floor. Although defendant told one of the others to tie him up, he was allowed to go home. When the police arrived, he talked to them and they later showed him five photographs from which he identified defendant as the person who shot Wade. In court, Harris again identified defendant as the person doing the shooting.

Webber Dowells testified that when he met defendant on June 21, 1979, the latter asked him to take a walk, and they were joined by Larry Wiggins. They had a conversation about robbing a woman who owned a building whom defendant thought would have some money since she collected rent. Defendant produced a handgun, and they proceeded to her building at 5021 South Indiana. They entered the yard, and Mrs. Wade, who was with Anthony Harris, told them to go to the front if they wanted to see someone; that shortly thereafter, he went up on the back porch of the first-floor apartment where he saw defendant inside. Wiggins said, "Bull, you in there?" and Wade then came in and asked defendant what he was doing in the apartment. He (Dowells) heard a struggle and then two shots, following which he saw defendant standing over Wade's body, pointing a gun at Harris whom he told not to say anything or he would kill him. The next day, Harris was in an unmarked police car with two officers and pointed him (Dowells) out as being one of the men who had been in Wade's apartment. He admitted being a drug addict at the time of the incident; that he had been using drugs on and off for four years; and that he "was promised something" for his testimony.

Stephen Hood, a Chicago police officer, found some belongings of Wade's in the second-floor apartment at 5021 South Indiana. He obtained an arrest warrant for defendant and, after learning he was in Birmingham, Alabama, he went there with his partner, Investigator Pochardo. They arrested defendant on September 29, 1980, and on October 1 flew him back to Chicago, taking him directly to police headquarters where he and Pochardo talked to him in the presence of

a State's Attorney.

Arthur Neville, an assistant State's Attorney, testified that about 2:50 p.m. on October 1, defendant gave him a statement before a court reporter who then typed the statement, and it was given to defendant who initialed each page and signed it. Defendant was advised of his constitutional rights before giving the statement, and in it he said, among other things, that he was also known as "Bull"; that he met Larry and Webber in a poolhall when they came to him for pills; that he was selling "T's and Blues" but he did not have any at that time, and they talked about making some money by robbing a store, somebody on the street, or taking a car; that Larry had a gun, and as they walked down an alley drinking wine, they saw Wade and some young persons cleaning her yard; that he knew she was the landlady, because he had stayed there on the second floor with someone named James once or twice a week for the previous month and a half; that they entered the yard and he walked up the stairs, and when she wasn't looking he entered her first-floor apartment and crawled under the dining room table; that after Wade and a boy came in, he heard her say, "My God, he is going to kill me," and then he heard a shot; that as she was lying on the floor, he grabbed the gun from Larry who was next to her; that the boy and Webber were at the back door, and he said to Webber, "You might as well kill him. No witnesses"; that Webber said he would not do it because he knew the boy's brother; that he disposed of the gun in some bushes in back of a poolhall; that when he learned Webber and Larry had been arrested, he went into hiding; and that, after staying in Chicago for a week or two, he went to Birmingham.

Evelyn Morris, defendant's aunt, testified that she lived in Birmingham and, after she told defendant that she needed his help because her husband was ill, he arrived in Birmingham about the middle of June 1979. She knew this was the time, because he had been there about a week before a policeman shot and killed a black woman named Carter in Birmingham on June 21 or 22 of that year.

Defendant stated that he went to Birmingham around the first or second of June when his aunt said she needed his help because her husband was ill. He recalled being there on June 21, 1979, because on June 22 a police officer shot a black girl in Birmingham. On September 30, 1980, in that city, Chicago police officers Hood and Pochardo told him they were picking him up for a robbery and murder. Defendant told them he knew nothing about the crimes, but on October 1 he was flown to Chicago and taken to a police station, arriving about 10:30 a.m., where he was handcuffed to a wall. At about 11 a.m., Po-

chardo told him he had talked to the State's Attorney and that if he gave a statement, the death penalty would not be sought. He made an oral statement but had not been given any *Miranda* warnings, although he did receive those warnings before giving a written statement later. He gave that statement because he had been threatened with the electric chair if he did not cooperate, and he was scared. He said he was able to describe the crimes in the statement, because the police officers had told him what occurred. He admitted that his nickname was Bull and that, in April 1979, he was out on bond for an unrelated criminal charge which was pending when he went to Alabama.

OPINION

Defendant first contends that the motion to suppress his written statements should have been granted because it was involuntarily given. The State has the burden to establish by a preponderance of the evidence that the statement in question was voluntarily made (*People v. Brownell* (1980), 79 Ill. 2d 508, 404 N.E.2d 181, *appeal dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59), and the key inquiry on such a motion to suppress is whether defendant's will was overcome at the time he made the statement (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726). A reviewing court considers all the evidence surrounding the giving of the statement (*People v. Kincaid*), and a finding of voluntariness will not be disturbed unless it is against the manifest weight of the evidence (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731).

At the hearing on the motion to suppress, the only testimony as to possible involuntariness was from defendant, who stated that he was told by Officer Pochardo that the State would seek the death penalty if he did not cooperate and that he gave the statement because he was scared and wanted to protect himself. However, Pochardo and another officer (Hood), as well as Assistant State's Attorney Neville, all testified that no threats or promises were made to defendant. The weight to be accorded the testimony of the witnesses was for the trial court, and because we do not believe the evidence indicates that defendant's will was overborne, we think it clear that the trial court properly denied the motion to suppress at that time.

Defendant, however, also contends that we should reverse the court's ruling in the light of trial evidence which was not presented at the hearing on the motion. It has been held that additional testimony at trial, received after a complete hearing on a pretrial motion to sup-

press and before the statement was admitted, may be considered by a reviewing court in passing upon the trial court's ruling on the motion. *People v. Braden* (1966), 34 Ill. 2d 516, 216 N.E.2d 808; *People v. Wade* (1979), 71 Ill. App. 3d 1013, 389 N.E.2d 1230.

■■ Defendant here points out that at the hearing on the motion to quash, he did not say that he was in Birmingham on the day of the shooting but that he did so testify at trial, as did his aunt. He argues that this additional evidence requires reversal of the court's ruling. However, we are of the view that it lends little support to defendant's contention, and from our consideration of the entire record, we are satisfied that the court's ruling was not against the manifest weight of the evidence.

Defendant further contends that even if his statement was otherwise admissible, the trial court erred in failing to excise that portion thereof which shows his involvement in other, unrelated crimes. In the course of his statement, the following colloquy took place:

> "Q [State's Attorney]. Will you tell us who you met prior to the armed robbery and the murder that took place earlier in the day.
>
> A [defendant]. I was standing down by the pool hall with Larry and Webber. I don't know their last names. They had come up to me and wanted pills. I was selling T's and Blues.
>
> Q. And did you not have any pills for them at that time?
>
> A. No.
>
> Q. Were Larry and Webber straight at that time, sober?
>
> A. I would never call them sober because they always seemed hyped to me anyway.
>
> Q. Did you have a conversation with them after they asked you for T's and Blues?
>
> A. Yes.
>
> Q. What did you talk about?
>
> A. We talked about making some money.
>
> Q. How is that going to happen?
>
> A. Robbery, stick up a store or something, or somebody on the street, or take a car, something like that. They needed money."

At trial, defendant argued that the references to his drug dealing were irrelevant and should have been excluded; however, the trial court denied his motion *in limine*, finding that the passage was relevant to show motive; to show the relationship among defendant, Wiggins, and Dowells; and to rebut defendant's alibi defense.

Generally, evidence that the accused committed other crimes unre-

lated to the offense charged is inadmissible if presented merely to establish his propensity to commit crimes (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200), for such evidence may "overpersuade the jurors and cause them to convict the defendant as an 'evil person' worthy of punishment rather than because he is guilty of the crime charged" (*People v. Butler* (1978), 63 Ill. App. 3d 132, 139, 379 N.E.2d 703, 708). However, this rule of exclusion if inapplicable where the evidence is relevant for any purposes other than to show a propensity for crime (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489), such as to place a defendant in proximity to the time and place of the crime, to aid or establish identity, to explain the circumstances of an arrest, to prove design, motive or knowledge, or to disprove an alibi (*People v. Romero* (1977), 66 Ill. 2d 325, 362 N.E.2d 288; *People v. Satchell* (1981), 94 Ill. App. 3d 422, 418 N.E.2d 1063), so long as the court determines that is probative value outweighs any prejudice to the accused (*People v. Stout* (1982), 108 Ill. App. 3d 96, 438 N.E.2d 952).

In the instant case, the court found that the passage in question was relevant to show defendant's motive; *i.e.*, to obtain money to purchase drugs. Defendant argues that this finding is based on mere speculation, because he never explicitly said "we committed the robbery in order to obtain money for drugs." Therefore, he maintains, his conviction should be reversed, citing *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238. There, the State argued that evidence of a subsequent arson was admissible in the defendant's murder trial because it manifested his purpose to avoid detection by concealing evidence. However, we believe that defendant's reliance on *Lindgren* is misplaced. The court there did not hold, as defendant posits, that the motive for a crime must be explicitly stated; rather, its relevance must be fairly inferrable from the evidence. In *Lindgren*, unlike here, the evidence not only failed to support the State's theory of relevance, but directly contradicted it. Here, we believe the motive relied upon by the court may be inferred from the passage quoted. An analogous situation arose in *People v. Schwartz* (1978), 64 Ill. App. 3d 989, 382 N.E.2d 59, where the defendant was charged with a murder that occurred as he and the decedent were weighing a recent drug purchase. We found testimony relating to drug dealing relevant to show motive, although it was never explicitly stated by any witness.

The passage in question also rebuts portions of defendant's alibi defense. He claimed that he was in Alabama at the time the crime occurred, and provided this statement only out of fear, using details of the crime supplied by police personnel. However, it appears from

defendant's own testimony that the police never mentioned prior drug dealing, the drug habits of his accomplices, or any specific motive for the crime. Therefore, this passage contradicts defendant's claim that he knew nothing about the crime other than the few details related to him by the officers.

Moreover, even if we were to find introduction of this evidence erroneous, testimony relating to other offenses does not *per se* constitute grounds for reversal. (*People v. Bynum* (1981), 102 Ill. App. 3d 461, 430 N.E.2d 110.) Where every element of the crime charged has been established by properly admitted evidence, the error is harmless (*People v. Bacon* (1980), 91 Ill. App. 3d 673, 415 N.E.2d 678) if that admissible evidence is so overwhelming that there is no reasonable probability that defendant would have been acquitted if the inadmissible evidence had been excluded (*People v. Thingvold* (1978), 66 Ill. App. 3d 1002, 384 N.E.2d 489). Here, two witnesses with an excellent opportunity to observe identified defendant as the man who committed the crimes charged. Furthermore, defendant himself made an extensive, detailed statement admitting his involvement therein. In the light of this evidence, we believe that "no fair-minded jury could reasonably have voted to acquit." *People v. Carlson* (1982), 92 Ill. 2d 440, 449, 442 N.E.2d 504, 508.

Defendant next maintains that the trial court should have granted his motion for a mistrial when the State's witness violated an *in limine* order. Defendant presented a pretrial motion asking that the court "exclude any reference to the fact that defendant was taken into custody at the Jefferson County Jail in Birmingham, Alabama." In the discussion on the motion, the prosecutor said that the State "would not be introducing any evidence that he was in custody for a burglary in Birmingham, Alabama." The court did not rule on the motion, and no request for a ruling was made by defendant, apparently because of the prosecutor's statement.

After Officer Hood had testified as a State's witness, he was recalled by defendant as his witness, and in answer to a series of questions by defense counsel, Hood stated that he had a conversation with defendant in Birmingham at the time of his arrest on September 29 and, at that time, he gave the *Miranda* warnings to defendant. The defense counsel then asked questions which were answered as follows:

> "DEFENSE COUNSEL: Mr. Pochardo, as a matter of fact talked to him on the 29th, when you saw Mr. Wallace didn't he, if you recall?
>
> A. I believe I did the talking on the 29th, yes sir.

Q. In going back to October 1 before you had this conversation, you gave him his rights too didn't you?

A. No sir.

Q. You didn't give him his rights?

A. On October 1st?

Q. Right.

A. When we picked him up at the jail?"

Defendant's motion for a mistrial at that time was denied, and in his brief here, defendant contends the trial court erred in refusing a mistrial because the jail reference was in violation of the *in limine* order. We reject this contention, for a number of reasons—first, because no order was entered; second, because the prosecutor stated only that he would not introduce any evidence that defendant was in custody for a burglary in Birmingham and no such evidence was introduced; and third, because the jail reference was brought out by defense counsel in his direct examination of Hood, who was defendant's witness, and he cannot now complain of error relating to such testimony. (See *People v. George* (1971), 49 Ill. 2d 372, 274 N.E.2d 26.) Moreover, a trial court does not abuse its discretion in failing to grant a mistrial where, as here, the statement in question was an isolated, inadvertent reference, the damaging effect of which could have been remedied by an instruction to disregard it. *People v. Winfield* (1983), 113 Ill. App. 3d 818.

▮ Further, we find no merit in the additional argument of defendant that the court should have neutralized the effect of the unresponsive answer by an admonition or instruction to the jury. There is no requirement on the part of the court to do so where defendant did not move to strike the reference or request that the jury be admonished or instructed to disregard it. *People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651.

▮ Finally, defendant contends that the trial court erred in permitting the State to impeach him on a collateral matter by cross-examining him with regard to a bond forfeiture in an unrelated criminal case. Cross-examination which is limited to the subject matter raised on direct examination is proper (*People v. Brown* (1982), 106 Ill. App. 3d 1087, 436 N.E.2d 696), and it may be used "to develop all circumstances within the knowledge of a witness which explain, qualify, discredit or destroy his direct testimony, although the circumstances may incidentally constitute new matter which aids the cross-examiner's case" (*People v. Olbrot* (1982), 106 Ill. App. 3d 367, 374, 435 N.E.2d 1242, 1248). In the instant case, defendant testified on direct exami-

nation that he went to Alabama to assist his aunt in caring for her invalid husband. The trial court allowed the State to inquire whether defendant was out on bond at the time in question and whether he forfeited that bond by failing to return. It ruled, and we believe properly so, that defendant opened the door to that question by relating his motive in going to Alabama, and the State was therefore entitled to show that defendant was motivated, not by altruism, but by a desire to avoid prosecution. This situation is entirely different from that in cases relied upon by defendant in arguing that he may not be impeached on a collateral matter. For example, in *People v. Persinger* (1977), 49 Ill. App. 3d 116, 363 N.E.2d 897, cited by defendant, a prosecution witness denied during cross-examination that she had been treated for a drug overdose, and we held that the trial court properly excluded other witnesses offered for the sole purpose of rebutting that denial. Thus, *Persinger* does not address the proper scope of cross-examination, which is the issue before us here; rather, it concerns impeachment on a collateral matter contained in a witness' cross-examination through the introduction of *extrinsic* rebuttal evidence.

For the reasons stated, defendant's conviction is affirmed.

Affirmed.

WILSON, P.J., and LORENZ, J., concur.