THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK GROLEAU, Defendant-Appellant.

Second District   No. 2—85—0979

Opinion filed June 12, 1987.

Bryan R. Winter, of Fuqua, Winter, Wysocki & Stiles, of Waukegan, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Dale M. Wood, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

Following a jury trial, defendant, Mark Groleau, was convicted of murdering (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) his ex-wife, Sharon Groleau. Defendant was sentenced to 45 years' imprisonment. On appeal, he argues that the trial court erred: (1) in admitting into evidence the hearsay testimony of a State's witness regarding a discussion concerning "ex-wives" in which defendant was a participant; (2) in limiting the redirect examination of an alibi witness for purposes of rehabilitation; (3) in admitting evidence of a prior altercation between defendant and his ex-wife; (4) in not granting him a mistrial when the prosecution remarked in front of the jury that defendant could not be sentenced to death; (5) in allowing certain testimony presented in rebuttal to exceed the scope of rebuttal; and (6) in its decision not to return 10% of defendant's posted bail. We affirm in part, reverse in part, and remand for further proceedings.

Mark and Sharon Groleau were married in September 1982. They had a daughter, Amy, born in May 1983. Defendant and Sharon were divorced in July 1984. Initially, both parents shared custody of Amy. This situation was modified in October 1984 when defendant obtained sole custody of the child with his ex-wife having reasonable visitation rights. During one of these visits on January 2, 1985, Sharon picked up Amy to go shopping, but instead took the child to Virginia to visit her brother. Defendant filed kidnaping charges against Sharon when the child was not returned home later that evening. Upon being informed by Sharon's family where she and the child were, Mark in a telephone conversation with his ex-wife promised her that he would try to work things out between the two of them if she came back to Illinois with Amy. He sent Sharon a plane ticket, and she and the child returned to Illinois on Saturday, January 5, 1985. The following Monday defendant contacted his attorney to restrict the terms of his ex-wife's visitation rights to include the provision that she was not allowed to see the child alone but only in the presence of her parents or defendant's parents.

Meanwhile, Sharon was allowed to stay at defendant's apartment over the weekend. On Monday he informed her that she had to leave, which she refused to do. Incensed, defendant bodily removed her from the apartment clad only in a nightgown, even though it was a rather cold January day. Two State's witnesses testified that they had seen defendant "pushing and choking her" trying to get her out of the apartment. Soon thereafter, defendant allowed Sharon back in to phone her father to pick her up.

Two days later on January 9, 1985, Sharon came by again to pick up Amy. Defendant did not allow the child to accompany her mother, stating that he was afraid that the child would again be kidnaped. Defendant called the police, who informed Sharon that she would have to leave. Immediately thereafter, Sharon filed a battery report with the police regarding the January 7, 1985, incident. An officer came to talk to defendant at his place of employment, the Great Lakes fire station, regarding Sharon's accusation, but no charges were filed.

The incident that gave rise to the murder charge against defendant took place on January 27, 1985, three weeks after the events described above. Defendant testified that on that Sunday morning Sharon was dropped off at his apartment by her sister at approximately 9:30 a.m. for her visit with Amy. An argument ensued between Sharon and defendant regarding the fact that Amy's clothes did not match. According to defendant's testimony, while she was changing the child's outfit Sharon had a nose bleed. Defendant accused her of continuing to use cocaine, despite her promise to the contrary. According to defendant, Sharon answered that since they were divorced "I [Sharon] can do anything [I] want to do, and you [defendant] can't—. You have nothing to say about it." Sharon, nevertheless, denied using drugs and claimed that she had a cold.

Defendant further testified that he threw a towel at her to wipe her nose while she was sneezing on the child. After Sharon changed Amy's blouse once again, defendant testified that he was so aggravated by his ex-wife's behavior, that he had to leave the apartment and went to his parents' house in Winthrop Harbor, a 7½-minute car ride from his apartment in Zion. Defendant testified that he left his house sometime after 9:30 a.m. and arrived at his parents' house before 10 a.m. He further testified that while at his parents' house, he did his laundry, which he had brought with him from home, and also burned some trash in the backyard in a trash burner. At trial, testimony was presented that among the burned trash a small wood fragment was found which could have come from a baseball bat.

This fact was never conclusively established. Also, a towel was found among the burned items. The towel was a part of a set that defendant's parents testified belonged to them, but another towel from the set was observed in Sharon's hand when she was found dead later that day.

Defendant testified that at about 12:45 p.m. he telephoned a neighbor to ask whether her small son could come out to play with Amy. When this did not happen, defendant returned with Amy to the apartment at 1 p.m. There, upon opening the door, he observed Sharon lying on her stomach on the floor. Defendant took Amy to his landlord's apartment, where he called the rescue squad. On the phone he informed them that he suspected his wife had overdosed, but that there was some blood. Defendant is a trained fireman and, thus, had had training in emergency medical techniques and had observed overdoses before. At trial in cross-examination, he testified that it seemed rather peculiar to him that this time there was blood accompanying an overdose. Defendant at no time made any attempts to determine his ex-wife's condition or to administer any first aid. When the rescue squad arrived, they immediately ascertained that the death was a homicide, and the police were called.

At trial, testimony was presented that Sharon Groleau died of blunt trauma to the head causing head and brain injuries. According to a pathologist, who performed the autopsy on Sharon's body, such a wound would have been inflicted by a long, hard and probably round object.

An investigation of the homicide scene by the police revealed that blood which was later identified as Sharon's was splattered on the walls of the apartment. A child's blouse splattered with blood was also found rolled up in a towel. The blood was later identified as possibly that of defendant's ex-wife. Tests for the presence of blood were also conducted on laundry items defendant left in his parents' washing machine, and the results were negative. Same was true for items retrieved from the burned-out trash.

Defendant's apartment showed no signs of forced entry. No dusting for fingerprints took place. The time of the homicide was established by the coroner at around 10 a.m. by the testimony of a next door neighbor who had heard some pounding in defendant's apartment around that time.

At about 4:15 p.m. on the afternoon of January 27, 1985, defendant was transported to the sheriff's office in Waukegan, where, after receiving his *Miranda* rights, he was interrogated by two officers regarding the events of that day. One of the officers

testified at trial that during the interrogation defendant had made several noteworthy comments. In response to a request for a statement, defendant responded, "Why do you want a statement from me when you already know what happened?" He further commented, "I have no regrets," and wanted to know "what's going to happen to my baby." According to the officer, defendant inquired as to how many people in Lake County get the death penalty. Defendant in his testimony acknowledged making these statements but claimed that they were taken out of context.

On February 4, 1985, eight days after the homicide, defendant was arrested and charged with murder. Defendant pleaded not guilty. The jury returned a murder verdict from which defendant appeals.

Defendant contends on appeal that, among other things, the trial court erred in not excluding the hearsay testimony of the State's witness with regard to a general discussion concerning "ex-wives." We agree.

The last witness called by the prosecution was Efrain Candelaria, a fireman, who worked at the same station house as defendant. Over defense objections, Candelaria testified that two weeks prior to defendant's ex-wife's death, he overheard a conversation at the station house, defendant being one of the participants. Candelaria did not specifically recall what each one of the three participants to the conversation had said. He recalled though that one of the firemen had made the comment that "you could get rid of your wife by either an injection or somebody breaking in and hitting her over the head." On redirect examination, Candelaria testified that he did not come forward with this information until one week prior to trial because he was afraid for his family, but that his conscience bothered him, and, after consulting with his wife and his priest, he was persuaded to inform the authorities. Candelaria's testimony regarding the conversation was not entirely corroborated by the three participants. The three of them remember that there was a conversation regarding the fact that ex-wives may be bothersome and that Candelaria had admonished them about talking about such subjects. One fireman remembered some reference to drugs during that conversation. None of the participants recalled any details regarding any remarks involving "hitting [someone] over the head."

█▌ █ Generally, "hearsay" is testimony of an out-of-court statement offered to establish the truth of the matter asserted therein and resting for its value upon the credibility of the out-of-court asserter. (*People v. Rogers* (1980), 81 Ill. 2d 571, 577, 411 N.E.2d 223.)

Hearsay evidence is generally inadmissible unless it falls within an exception to the hearsay rule. *People v. Coleman* (1983), 116 Ill. App. 3d 28, 33, 451 N.E.2d 973.

At trial, the prosecution claimed that Candelaria's testimony was offered to establish defendant's state of mind, a purpose which constitutes one of the exceptions to the hearsay rule. (See *People v. Lang* (1982), 106 Ill. App. 3d 808, 436 N.E.2d 260.) The State argued that Candelaria's testimony was relevant even though he did not know who made the specific comment regarding ex-wives, because defendant was present at the conversation, and his state of mind could have been influenced by what was said.

■■ ■ Even assuming that Candelaria's testimony was properly introduced as an exception to the hearsay rule, we find that its probative value is outweighed by its prejudicial effect to the defendant. (See *People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295.) Generally, admission of evidence is discretionary with the trial court and will not be disturbed on review unless there was a clear abuse of discretion at the trial level. (See *People v. Adams* (1962), 25 Ill. 2d 568, 185 N.E.2d 676.) We conclude that in denying defendant's objection to Candelaria's testimony, the trial court abused its discretion.

In *Monroe* the Illinois Supreme Court defined "relevant evidence" as follows:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (*People v. Monroe* (1977), 66 Ill. 2d 317, 322, 362 N.E.2d 295.)

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to defendant (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 489, 485 N.E.2d 1292), and the court and the prosecution are under a duty to avoid the introduction of such evidence. (*People v. Jones* (1982), 94 Ill. 2d 275, 286, 447 N.E.2d 161, *cert. denied* (1983), 464 U.S. 920, 78 L. Ed. 2d 264, 104 S. Ct. 287.) In deciding whether Candelaria's testimony was prejudicial enough to warrant its exclusion, we examine its possible effect on the jury. The State argues that since the other two firemen allegedly present do not recall making the statements in question but merely recall being present during the conversation and place Candelaria in the vicinity, it follows logically that the jury could have concluded that defendant made the statements. The State argued in its brief in this court:

"Significantly, the defendant did not deny making any statements, but stated only that he did not recall any. He also did not deny being present for the conversation, nor did he deny that he heard the conversation.

The People state that, even before the testimony of Grobelach and Otto [the other two firemen], it is inferable from Candelaria's testimony that the defendant participated in the conversation with the other two firemen and that in turn, he made at least some of these remarks. Given the testimony of the other two firemen involved, neither of whom admitted making the disparaging remarks, *it becomes clear that the defendant, in fact, made these remarks.*" (Emphasis added.)

This argument runs contrary to the prosecution's original contention that Candelaria's testimony was offered for the proposition of establishing defendant's state of mind, *i.e.,* that he was present during a conversation where possible means of "getting rid" of ex-wives was discussed. The prosecution's contention on appeal is that the conversation exchanges testified to by Candelaria as a prosecution witness and by the two firemen as witnesses for the defense would lead one to infer that, in fact, defendant made the controversial statements. Such a conclusion would be quite misleading to the jury and, resultantly, very prejudicial to him. Furthermore, the prosecution's conduct emphasized the import of Candelaria's testimony. Candelaria was called as the last prosecution witness, and his honesty and pangs of conscience were highlighted in the State's closing arguments. See *People v. Mitchell* (1984), 129 Ill. App. 3d 189, 472 N.E.2d 114.

■ In summary, we conclude that the prosecution by its conduct gave Candelaria's testimony a disproportionate importance unwarranted by its content with the likely result of misleading the jury. (See *People v. Lampkin* (1983), 98 Ill. 2d 418, 457 N.E.2d 50.) The prejudicial effect of Candelaria's testimony is further enhanced by the fact that no limiting instruction was given to the jury. See *People v. Taylor* (1978), 66 Ill. App. 3d 907, 384 N.E.2d 558.

We, therefore, hold that the trial court erred in not excluding Candelaria's testimony. Further, we hold that this error was not harmless. It is our opinion that the substantial prejudicial impact of this testimony on the jury outweighed any possible probative value it may have had. See *People v. Mitchell* (1984), 129 Ill. App. 3d 189, 472 N.E.2d 114; accord, *People v. DeHoyos* (1976), 64 Ill. 2d 128, 355 N.E.2d 19.

■ Next, defendant contends that the trial court erred in not

allowing him an opportunity to rehabilitate his alibi witness in redirect examination. We agree.

Robinson, a neighbor of defendant's parents, testified that he had seen defendant's car in his parents' driveway at 10 a.m. on the day of the murder. Ten a.m. was established as the approximate time of the homicide. He further testified that when he returned from church at 12:35 p.m. or 12:45 p.m., the car was still there. On cross-examination by the prosecution, Robinson testified that the first time he gave the prosecution this information was two weeks prior to trial. On redirect examination the defense tried to establish that Robinson had tried to contact the State's Attorney's office on several occasions but that his phone calls were not returned. The State objected, and the trial court sustained the objection. In its closing argument, the prosecution highlighted the fact that Robinson did not reveal this information until two weeks prior to trial to further put into question this witness' credibility. At trial, the court, in sustaining the State's objection to Robinson's redirect examination, accepted the prosecution's argument that since Robinson was under subpoena to testify, his attempts to contact the State's Attorney were irrelevant.

We agree with defendant's contention that, generally, a defendant has the right to rehabilitate a witness who was previously impeached. (*People v. Moore* (1980), 92 Ill. App. 3d 71, 73, 414 N.E.2d 274.) This would be particularly true in the case of an alibi witness. (See *People v. Brockman* (Colo. 1985), 699 P.2d 1339.) Although the court should admit into evidence the testimony to rebut a charge of recent fabrication (*Waller v. People* (1904), 209 Ill. 284, 286, 70 N.E. 681), the determination of whether a particular line of inquiry in rehabilitation of a witness is proper lies largely within the discretion of the trial court, which is in the best position to weigh the effect of both the impeachment and the attempted rehabilitation (*People v. Moore* (1980), 92 Ill. App. 3d 71, 73-74, 414 N.E.2d 274).

In *People v. Burke* (1964), 52 Ill. App. 2d 159, 201 N.E.2d 636, the appellate court stated that the rehabilitation on redirect should not be allowed when the reasons for the witness' bias, revealed in cross-examination, have no tendency to rehabilitate the witness, but serve merely to introduce inflammatory matter into the case. (52 Ill. App. 2d 159, 161, 201 N.E.2d 636, 637.) In the instant case, the court did not allow Robinson to testify as to why he did not inform the State's Attorney of his information until eight months into the investigation. We do not find that the testimony Robinson was prepared to present on redirect constitutes "merely inflammatory mat-

ter." Therefore, in fact, the jury was left with the impression that the alibi testimony was of recent fabrication. See *Waller v. People* (1904), 209 Ill. 284, 70 N.E. 681.

▮ We find that the trial court abused its discretion in not allowing defendant to rehabilitate his alibi witness. Furthermore, we cannot say that this error is harmless given the importance of this witness, who is the only one able to place defendant away from the scene of the homicide. The error is compounded by the fact that the prosecution was allowed to rehabilitate Candelaria on a similar point, *i.e.*, the reason for the delay in coming forward with the information.

Therefore, we reverse and remand for a new trial on the two grounds discussed above, the impropriety of allowing Candelaria's testimony into evidence and the preclusion of defendant's ability to rehabilitate his alibi witness.

In view of the fact that there may be a new trial on remand, we will take the opportunity to comment on a few other issues that might arise in such a trial.

▮ Defendant contends that the trial court erred in allowing into evidence testimony regarding the January 7, 1985, altercation between defendant and his ex-wife. We conclude that the trial court did not err in allowing this testimony into evidence. The general rule is that evidence of offenses other than those for which a defendant is being tried is inadmissible. (*People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288.) The underlying rationale is that such evidence " 'is objectionable "not because it has no appreciable probative value, but because it has too much." (1 Wigmore, Evidence, 3d ed., sec. 194.)' " (*People v. Romero* (1977), 66 Ill. 2d 325, 330, 362 N.E.2d 288.) Specifically, evidence of other crimes is inadmissible if relevant only to show defendant's propensity to commit a crime. (*People v. Jones* (1985), 105 Ill. 2d 342, 358, 475 N.E.2d 832.) Nevertheless, the exception to this rule provides that evidence relevant to the main issue which tends to prove defendant's motive or intent is admissible. (*People v. Manzella* (1973), 56 Ill. 2d 187, 197-98, 306 N.E.2d 16, *cert. denied* (1974), 417 U.S. 933, 41 L. Ed. 2d 236, 94 S. Ct. 2644.) The probative value of the evidence of prior acts must outweigh its prejudicial impact on the jury. *People v. Hendricks* (1986), 145 Ill. App. 3d 71, 106, 495 N.E.2d 85.

In his argument defendant has attempted to distinguish this case from *Manzella* by asserting that *Manzella* dealt with a series of incidents that took place prior to the homicide, while in the instant case there was only one altercation between defendant and his ex-wife.

We agree with the State that distinguishing these two cases on a factual basis is inapposite. The primary concern is whether the underlying legal theory espoused by the Illinois Supreme Court in *Manzella* is applicable to the instant case. We find that, since the testimony regarding the altercation was presented by the State to establish defendant's motive for committing the offense, the *Manzella* rationale applies. Therefore, this evidence was properly introduced. Accord, *People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666.

Defendant also cites *People v. Bacon* (1980), 91 Ill. App. 3d 673, 415 N.E.2d 678, to support his contention that the evidence regarding the altercation should have been suppressed. In *Bacon* the appellate court held that testimony regarding defendant's prior altercation with the victim consisting of grabbing her neck and attempting to push her head into the toilet was improperly introduced. The court held that this evidence was not sufficiently relevant regarding defendant's attitude toward his wife. (91 Ill. App. 3d 673, 681, 415 N.E.2d 678.) We agree with the State that *Bacon* is not applicable to the instant case in that in *Bacon* defendant's action was not against a backdrop of marital discord as here. Furthermore, the *Bacon* court held that the introduction of the evidence was harmless error as the erroneously admitted evidence did not prove any element of the crime not established by other properly admitted evidence. 91 Ill. App. 3d 673, 681-82, 415 N.E.2d 678.

■ In the instant case, the altercation in question was the culmination of a series of incidents between defendant and his ex-wife particularly significant in light of his obvious fear that his child would again be taken away from him. Thus, the prior altercation was relevant to show defendant's state of mind regarding Sharon and, therefore, properly admitted.

■ Defendant next contends that the trial court erred in not granting his mistrial motion presented when, despite a court order to the contrary, the prosecution proceeded to question the arresting police officer regarding the fact that defendant's offense was not punishable by death. In view of our disposition, we need not address this issue, but, rather, remark upon the conduct of the assistant State's Attorney. Officer Fagan testified at trial that defendant had inquired as to how many people get the death penalty in Lake County. Defense counsel objected. In chambers, the trial court made a ruling that no comments will be made in court regarding the death penalty issue. The court commented that if any information is

to be conveyed to the jury he will do so at the time of instruction. Shortly thereafter the State's direct examination of Officer Fagan resumed as follows:

"BY [State's Attorney]:
Q. Mr. Fagan, would you tell the members of the jury what you said to the defendant after he asked you how many people in Lake County got the death penalty?
A. Yes, sir. I told him I wasn't specific on how many people in Lake County had received the death penalty, and I told him in Illinois law there are varying degrees of law, to include murder, voluntary manslaughter, and involuntary manslaughter.

\* \* \*

BY [State's Attorney]
Q. And you know, of course, that this is not a death penalty case?"

Canon 7, Rule 7—106(c)(7) of the Code of Professional Responsibility (87 Ill. 2d R. 7—106(c)(7)) states:

"In appearing in his professional capacity before a tribunal, a lawyer shall not

\* \* \*

(7) intentionally \*\*\* violate any established rule of procedure or of evidence."

Here, the trial court had ruled that no comments regarding the death penalty issue were to be elicited in open court. The assistant State's Attorney apparently violated this express court ruling. Therefore, we find the assistant State's Attorney's conduct to be improper. See also *People v. Ray* (1984), 126 Ill. App. 3d 656, 467 N.E.2d 1078.

■ Finally defendant contends that the trial court erred in not ordering the return of more than 90% of his bail bond. We agree.

Defendant's bond was set at $1 million. With the assistance of his parents he posted 10% of his bond, *i.e.*, $100,000. Upon his conviction for murder, the clerk of the court, pursuant to section 110—7 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 110—7(f)), returned $90,000 or 90% and retained $10,000 or 10% of the amount posted. Defendant filed a motion for the return of the remaining 10%. The trial court ruled that, based on the language of the statute as a whole, it did not have discretion to return the 10%.

Section 110—7(f) provides in pertinent part:

"When the conditions of the bail bond have been performed

and the accused has been discharged from all obligations in the cause the clerk of the court shall return to the accused, unless the court orders otherwise, 90% of the sum which had been deposited and shall retain as bail bond costs 10% of the amount deposited. However, in no event shall the amount retained by the clerk as bail bond costs be less than $5.

At the request of the defendant the court may order such 90% of defendant's bail deposit, or whatever amount repayable to defendant from such deposit, to be paid to defendant's attorney of record." Ill. Rev. Stat. 1985, ch. 38, par. 110—7(f).

Defendant relies on *People v. Fox* (1985), 130 Ill. App. 3d 795, 475 N.E.2d 1, for his argument that the trial court has discretion under the statute to return more than 90% of the posted bail. In *Fox* the appellate court interpreting the phrase "unless the court orders otherwise" held that the trial court did have such discretion. (130 Ill. App. 3d 795, 797, 475 N.E.2d 1.) The *Fox* conclusion was based on the court's analysis of the precursor 1963 statute which stated that the clerk of the court " '*shall* return to the accused 90% of the sum which had been deposited and *shall* retain as bail bond costs 10% of the amount deposited.' " (Emphasis in original.) (130 Ill. App. 3d 795, 797, 475 N.E.2d 1.) We agree with the *Fox* rationale that the amendatory language in the current statute confers discretion on the trial court.

We disagree with the State's position that in this case, unlike the *Fox* situation, the trial court understood it had discretion which it exercised. The trial court here took exception to the *Fox* rationale and asked this court to clarify the statutory interpretation. Therefore, we reverse and remand on this issue to enable the trial court to exercise its discretion regarding defendant's motion to return more than 90% of his bail deposit.

The judgment of the circuit court of Lake County is affirmed in part and reversed in part, and the cause is remanded for further proceedings.

Affirmed in part, reversed in part and remanded.

NASH and HOPF, JJ., concur.