THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SONDRA BANKS, Defendant-Appellant.

First District (5th Division)   No. 1—88—0628

Opinion filed March 13, 1992.

Randolph N. Stone, Public Defender, of Chicago (Robert D. Glick, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Michael Latz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

A jury found defendant Sondra Banks guilty of one count of first degree murder and two counts of attempted murder. The court sentenced defendant to 25 years' imprisonment for murder, and two terms of 12 years' imprisonment for the two attempted murder counts, with the sentences to run concurrently. On appeal, defendant contends that the Illinois murder statute is unconstitutional and that

the first degree murder conviction should be reduced to second degree murder because she acted "under a sudden and intense passion resulting from serious provocation." Ill. Rev. Stat. 1987, ch. 38, par. 9—2.

On August 29, 1987, during an argument at a block party, 36-year-old Juliette Clayborn was shot and killed. Juliette's brother and sister, Julius Clayborn and Veronica Grover, were shot and wounded. Defendant was also shot, although not by any of the three victims. She suffered a flesh wound entering her back and exiting her chest. She also had a laceration on her head and a bruised wrist.

Kerwana Clayborn, the 19-year-old niece of the three victims, testified for the State that on August 29, 1987, at about 5 p.m., she was at a restaurant with her 14-year-old cousin, a 14-year-old friend named Lonya Sylvester, and Juliette's 17-year-old daughter Elvira Clayborn, when she saw two of defendant's nieces, 14-year-old Kenya and her twin sister Kelly. Kenya and Kelly argued verbally with Lonya.

Later, at 9 p.m., Kerwana saw Kelly and Kenya again, in front of the home of Kerwana's grandmother, Elvira Grover (hereinafter Mrs. Grover), during the block party. Defendant lived in a "courtway" building across the street but farther down the block. Lonya and the twins argued verbally again. The twins then left.

At about 11:30 p.m., Kerwana saw defendant and the twins down the block talking with Juliette, Lonya, and LaTonya Woodard. Mrs. Grover went over to the group of six people. Approximately 20 or more people gathered, including some people who had come out of defendant's building. Kerwana walked over to the group and stood about 10 feet from Juliette and defendant.

Kerwana testified further that defendant asked Juliette why she had interfered in the argument between defendant's nieces and Juliette's nieces. Defendant also stated, "I'm Sondra B. You must [sic] don't know who I am. You better read up on me." Juliette tried to move away from defendant. Mrs. Grover stood between Juliette and defendant, encouraging Juliette to return to the house. Julius also stood near them. Kerwana did not see any weapons. As the argument continued, defendant "kind of moved my grandmother [Mrs. Grover] to the side or tried, and then she pushed Juliette." Juliette was moved backwards by the push.

Kerwana saw Veronica, who stood behind defendant, then hit defendant on the right side of the face with her fist. At that point, "everybody got into a big crowd," and they began "tussling" with and pushing each other. "Everybody was talking at the same time."

Kerwana did not see defendant walk over to a car and return. "Next thing I know *** I heard [two] gunshots ***." Kerwana began running away, and within seconds she heard two more shots. Kerwana could not see who had the gun. She did observe, however, that Juliette had no weapon in her hands. She looked back and saw Juliette hold her stomach and fall to the ground.

At the hospital, Kerwana learned that Juliette died from an abdominal gunshot wound. Juliette's brother, Julius, who was on crutches with a cast on one leg, was shot in the other leg. Juliette's sister, Veronica, was shot in the arm.

Elvira Clayborn, Juliette's 17-year-old daughter, testified for the State. She testified similarly to Kerwana regarding the 5 p.m. and 9 p.m. encounters with the twins.

At about 11:30 p.m., Elvira was in front of her grandmother's home when she saw defendant and the twins cross the street and approach Juliette, Lonya and LaTonya, who were walking to a friend's house to get diapers. While walking back from the friend's house, defendant and the twins "crossed the street again, and that's when I went down the street, and they stopped my mother," LaTonya, and Lonya, who held a baby. One of the twins pushed Lonya. Juliette urged defendant not to get involved in "kids' stuff," *i.e.*, the argument between defendant's nieces and Juliette's nieces.

Elvira heard defendant say, "I'm Sondra B. You don't know me. You better ask somebody. I'll kill somebody around here." Defendant kept repeating, "I'll kill somebody around here." Juliette tried to "go home. But [defendant] kept getting in my mother's face pushing her and kept arguing with my grandmother." Defendant pushed Mrs. Grover "out of the way" and pushed Juliette two or three times. Defendant told Mrs. Grover to "get out of the way [be]fore somebody get [*sic*] killed."

There were about 25 people present, some of whom were defendant's family or friends, and some of whom were Juliette's family or friends. Juliette did not have a weapon. Elvira did not see anybody in her family with weapons. At no time did she see her mother raise her hands, even when defendant pushed her.

Elvira saw Veronica punch defendant on the side of the face. Defendant then "ducked like, like tried to weave it out, and then went over to the car." Elvira stood about 10 feet away from the car. A man, whom Elvira had seen before but did not know his name, was standing next to the car and handed defendant something. "I don't know what she got, but some man put something in her hand, and that's when I heard the shots."

Elvira heard two shots, then looked over and saw defendant holding a gun, aiming it at Juliette. Elvira looked at defendant and heard defendant say to Juliette: "Now, bitch, you gon' die." Elvira watched as defendant fired a third shot directly at Juliette, hitting her in the stomach. Juliette fell to the ground. Elvira then heard more shooting from the courtway building across the street.

Julius Clayborn, Juliette's 35-year-old brother, testified for the State that on August 29, 1987, at 11:30 p.m., he was at his mother's home. At the time, he had a broken knee and wore a cast on one leg and could walk only with crutches. He saw his sister Juliette walking down the street with Lonya, LaTonya and the baby, going to a friend's house. Defendant and the twins crossed the street and approached Juliette. Julius heard them arguing, and he went down the block and stood next to his sister.

Julius heard defendant ask what Juliette "had to with the argument," and Juliette replied, "This is kids' arguments, *** so grown-ups have no business getting off into it." Defendant replied, "Bitch, don't you know me." Defendant began shoving Juliette. Julius and another man "broke them up." Defendant went "back across the street," and Juliette "continued down the street" to her friend's house.

Soon Julius saw Juliette, LaTonya, Lonya and the baby returning. Defendant and the twins again "came across the street, and one of them hit Lonya when she was carrying the baby." Julius again walked down the street, along with his mother, Mrs. Grover. Defendant was pushing and shoving Juliette, saying: "I'm Sondra B. I'm Miss B. Bitch, don't you know me?" Juliette replied: "I don't feel like fighting, Sondra, because this is kids' arguments. We grown-ups don't have no business fighting about kids' arguments." Julius tried to step in between them, but defendant "wouldn't let me. She moved me." Mrs. Grover tried to intercede, but defendant "nudged" Mrs. Grover, pushing her off to the side, and "shoved [Juliette] again." "Everytime we pulled my sister back, [defendant] kept approaching her getting up in her face."

Julius then saw Veronica hit defendant in the face. Defendant then "faded back out [of] the crowd," and went over to a car where four or five men were standing. The 20 or 25 people in the crowd were shoving and pushing each other. Julius saw one of the twins "grab a pipe and attempt to swing at my sister" Veronica. Julius, leaning on his crutches, was able to take the pipe away from the twin. Julius looked over at defendant, who stood at the car about 10 feet

away, and Julius had a clear, unobstructed view of defendant. "At that instant I seen Sondra grabbed a pistol from somebody's hands."

Defendant then fired the gun at Julius, striking his left thigh with the first shot. She next aimed at Veronica, shooting her in the arm. Defendant then walked towards Juliette, saying, "Bitch, I told you there would be dead bodies out here tonight." Julius saw defendant shoot Juliette in the stomach. He then saw her fire a fourth shot "[i]nto the crowd." As defendant ran from the scene, Julius heard further gunshots from the courtway building across the street. Julius never saw any weapons in the hands of his family members. Julius also testified that Juliette was blind in one eye and she had vision problems with the other eye.

Julius had pled guilty, five years earlier, to a misdemeanor theft charge.

Louis Clayborn, Juliette's 15-year-old son, testified for the State that on August 29, 1987, he was at his grandmother's home. Louis saw Juliette talking with defendant and the twins. Louis walked over to them. Defendant was "arguing at my mother and pushing her, shoving her." Defendant was also shoving Mrs. Grover. "I was walking around, like, and I was fixing to hit her and my mother said no." Juliette told Louis: "No. Don't do nothing. Don't hit her. We fixing to go home." Then he heard three shots. Louis was standing next to Veronica when she was shot. "Before I got a chance to run, I saw [defendant] with a gun cursing ***." Defendant said: "M----- f----- going to die tonight. Told y'all somebody going to be laying out here dead. It's going to be some dead bodies." Defendant then walked towards Juliette and shot her. Defendant then ran towards the car "and somebody pulled her down. *** And then she started running towards the courtway and I ran after her." At that point, Louis heard additional shots fired while defendant was running toward the courtway building.

Elvira Grover, the mother of the three victims, testified for the State that on August 29, 1987, she saw Juliette, Lonya and LaTonya walking home when defendant and the twins crossed the street and approached them. Mrs. Grover heard arguing and she ran over to Juliette. A crowd started to gather. Mrs. Grover urged defendant not to argue.

> "[Defendant] was calling my daughter a lot of bitches and whores and telling her 'You going to whip this bad ass tonight or I'm going to whip yours.' My daughter said, 'I'll be whatever you call me, but I'm not going to fight about no kidstuff [sic] because it don't make sense.' She said the argument was

over. [Defendant] start[ed] throwing her coat off and said, 'You're going to whip this bad ass today.' So my daughter said no. I caught her by the arm, and I said, 'Come on Juliette and let's go home.' "

Mrs. Grover moved between defendant and Juliette. "[Defendant] told me to get out of her m----- f------ face and she pushed me back." Defendant continued pushing Juliette. "Juliette tried to go home, but [defendant] would get between myself and Juliette to keep her from going. She would step around in front of her so she couldn't pass by." Defendant kept "jumping around past me in front of my daughter's face telling me, 'No. She gon' fight tonight.' "

Defendant then "went into the crowd." "The next thing I saw, I saw [defendant] come out of the crowd and back up beside of a car. At that time I saw someone put a gun in her hand." Mrs. Grover heard two shots fired. "Then [defendant] stepped up one step toward my daughter and myself. She said, 'Now, m----- f-----.' My daughter said, 'Now, m----- f-----, what?' [Defendant] said, 'It's going to be some dead bodies out here tonight.' " Defendant then shot Juliette in the stomach. Mrs. Grover heard or felt a bullet go past her as she bent over to help Juliette.

Veronica Grover, Juliette's 23-year-old sister, testified for the State that on August 29, 1987, at about 11:30 p.m., she saw a crowd of people around Juliette and defendant, who were arguing. Defendant kept telling Juliette "that she is going to fight her, going to make her fight her tonight." Juliette tried to walk away, but defendant "grabbed her and said, 'Don't walk away from me, bitch. I'm going to make you fight me tonight.' "

Defendant pushed Mrs. Grover twice, calling her a bitch, and pushed Juliette four or five times. Veronica then reached past her mother and struck defendant in the side of the face with her hand. Defendant swung back at Veronica, but she missed. "Then [defendant] bit down and went through the crowd to her car where men were standing. *** I seen a man. I don't know his name or who he was." The man, "who was leaning against the car opened up his black leather jacket, opened it up and handed [defendant] the gun and she reached for it." Defendant grabbed the gun, "came up with it like this and said, 'Bitch, is going to be a lot of dead bodies lying out here tonight.' " Defendant fired twice, striking Veronica once and Julius once. Defendant turned toward Juliette and said, " 'Bitch, I told you there was going to be some dead bodies lying out here tonight,' " Juliette said, "No way," and then defendant shot Juliette in the stom-

ach. Juliette at no time had a weapon. No one had a gun other than defendant.

Officer Charles Popielarz testified for the State that on August 29, 1987, he and his partner investigated the shootings. They were unable to locate a weapon. At about 1:30 a.m., they learned that defendant had been arrested leaving the hospital. At about 2:30 a.m., they brought defendant back to the hospital when she requested medical treatment for an injury to her head and one hand.

The parties stipulated that hospital personnel would testify that on August 30, 1987, at 12 p.m., Juliette was admitted with a gunshot wound in the abdomen. She was pronounced dead at 1:19 a.m. The hospital personnel would also testify that Julius was shot in the left thigh and was admitted to the hospital. On August 31, 1987, he underwent surgery to remove the bullet. The hospital personnel would testify further that Veronica was admitted and treated for a gunshot wound in the right forearm.

The hospital personnel would testify further that defendant entered the hospital in the early morning hours of August 30, 1987, giving the name of Dionne Banks and asking for treatment. Thereafter, she left the hospital without accepting treatment. She was then arrested. Later she was brought back by the police for treatment for a laceration on the back of her head, a bruised left wrist, and a "through-and-through gunshot wound *** with the entry on the right side of the back, *** and exit wound on the right side of the chest."

The parties also stipulated that the medical examiner would testify that the cause of Juliette's death was a gunshot wound to the abdomen and that a blood analysis showed no signs of alcohol.

Officer Jack Wilkins testified for the State that at the scene the police recovered an expended .38 cartridge. No weapon was recovered. Wilkins spoke with a man named Jerry Cunningham, who stated that he saw defendant shoot the victims. Wilkins later arrested defendant. The gunshot wound to defendant was such that it indicated she had been shot from behind.

Wilkins testified further that defendant gave the police five different versions of the incident. First, defendant said "that she had shot at the individual because they [the three victims] all had guns." Second, defendant said "that she had been arguing with a person and that they had all jumped on her and taken her gun away from her and shot her with it and she returned fire because of that." Third, defendant said that a "third party [not one of the victims] had been out on the street arguing and that she refused to identify that person. The victim's friend had taken the gun from him and shot her and that as

she was running away she had produced her own gun and fired and she was returning [fire] over her shoulder." Fourth, defendant stated that she argued with a woman "and that someone had struck her and that at that time she pulled the revolver from her pants pocket which she said she always carried and she shot that person and that she fired a gun subsequently in the direction of a person on crutches." Fifth, defendant gave a statement to an assistant State's Attorney, but then refused to sign it.

Linis Kelecius, an assistant State's Attorney, testified for the State that on August 30, 1987, he took a statement from defendant. Defendant gave him several versions of the shooting incident. The final version was that she argued with Juliette, and then someone hit her on the back of the head and pulled her hair. Defendant then "went into her pocket and pulled out a gun that she had with her all along, and after she pulled out her gun, [defendant] said that, that she saw a light-skinned Black man pull out a gun. After the light-skinned Black man pulled out the gun, he shot the gun at [defendant]." Defendant shot back at the man, but hit Juliette by mistake. Juliette had no weapons. Defendant fired another shot at the light-skinned black man, hitting him, and then began running. She then ran away and threw her gun down a garbage chute. After reducing the statement to writing, the assistant State's Attorney asked defendant to sign it, but she refused to read it or sign it.

Nineteen-year-old LaTonya Wood testified for the defense that she was present at the shooting. She walked down the street with Juliette and her 13-year-old sister Lonya, who carried LaTonya's four-month-old baby. Defendant and the twins crossed the street and approached them. Defendant and Juliette argued. Juliette said she did not want to get involved in kids' business. Defendant kept pushing Juliette. Juliette "wasn't really arguing or nothing like that. She really didn't even want to fight that night." Mrs. Grover tried to intervene.

LaTonya then saw Veronica hit defendant in the face. Defendant tried to strike back. LaTonya also struck defendant. "I was helping Veronica fight Sondra." LaTonya then saw defendant go over to a car. "Then she got a gun and then she started shooting." LaTonya saw Robert, one of Mrs. Grover's sons, throw defendant on the ground. LaTonya saw defendant shoot Veronica, who stood next to LaTonya.

LaTonya also testified that "[s]omebody gave Mrs. Grover a gun." LaTonya never saw the gun, however. She merely "heard [Mrs. Grover] tell one of her sons to go get it" before the fight began. LaTonya testified on cross-examination that it was Robert who left to get the gun. She had lied when she testified on direct examination

that she did not know which son left to get the gun. LaTonya had never told the assistant State's Attorney about a second gun. She had, however, previously told defense counsel about the second gun. She never saw a second gun, but there was one. "Because I know. *** I didn't have to see it, but I know another gun [was] out there."

LaTonya had previously been convicted of arson and placed on one year's probation.

Jerry Cunningham testified for the defense that on August 29, 1987, he lived in the same building as defendant. He walked over to where defendant stood arguing with Juliette. Juliette left, but later returned with "at least 14 people behind." They started arguing again. Julius and Mrs. Grover were also present. Mrs. Grover tried to intervene, urging defendant not to fight about "kids' stuff." Julius told defendant "to get out of his mother's face." Cunningham stepped in between defendant and Mrs. Grover and Juliette. Cunningham pushed defendant, telling defendant that she was being "disrespectful" to Mrs. Grover. Then Veronica reached over Cunningham and hit defendant. Defendant, however, did not strike Juliette. "She couldn't because I was between them." A "young stud about 14, 15" hit defendant with the jack. "[T]hat's when I started hearing the shot [sic]." There were "shots coming from both sides." He did not see which way defendant went. He never saw defendant with a gun. He did not see defendant shoot anybody. "She couldn't have because I was in the middle."

On cross-examination, Cunningham testified that defendant was a good friend of his. Cunningham admitted telling the police that defendant had reported to him that she had hidden the gun. "Right, because they asked me to do it because they tried to hook me up, involve me in this murder." Therefore, he lied to the police. "Yes, I lied to them. I told them I know where the gun's at. I was trying to get me out of the police station so I could break and run on them."

Cunningham testified that he was on parole for attempted murder and armed robbery. At the time of trial, however, he was in custody and on parole hold because of a pending aggravated battery charge.

Defendant, who was 24 years old, testified that on the night of August 29, 1987, she was shot in the side, her arm was fractured, and her head was "busted" and required stitches.

During the argument with Juliette, Veronica reached over Mrs. Grover and hit defendant on the side of her face. Louis, Juliette's 15-year-old son, hit defendant in the back of the head with something hard, like steel. She did not remember whether or not LaTonya struck her.

Defendant testified further that, at some point, Robert (Juliette's brother) shot defendant. She never told the police that Robert had shot her because "I didn't know his name at the time." She learned his name when someone visited her in jail. When Robert shot her, she was turned sideways, and he was not behind her, notwithstanding the fact that the bullet's entry wound was in her back.

She tried to fight her way out of the crowd, but she did not run to a car. "As I sat there and I seen the blood coming from my head, I said a couple of things to one of the Clayborns, and as I turned around, a guy handed me a gun. I did not run to no car." When she turned around, a young man said, "Hon, Sondra, this is what's happening," and he handed her a gun. She did not recall who the man was or whether he was a friend of hers.

Defendant was frightened and was "seeing death. I'm scared they are trying to kill me." It was definitely *prior* to getting the gun that she had been shot, hit in the head and face, and had fractured her arm.

Defendant then fired the gun once at Veronica, striking her arm. Defendant was not angry at Veronica for hitting her in the face. She mainly was "trying to protect myself for fear I was in." She did not intend to kill Veronica. She did not know if Veronica had a gun or other weapon. She shot because Veronica "was coming at me with the rest of them."

After the single shot fired at Veronica, defendant did not fire the gun again. Defendant heard several more shots, but did not know where they came from. Defendant saw "a couple guns out there" in the crowd. There could have been four, five, or more guns. "Looked like fifty of them out there."

Defendant did not shoot—or even see—Juliette. "Well, I was looking and it was more of them than us as it was like thirty there to twenty and talking to Veronica, they telling her, you know, this is the way you all want to play. These are my exact words. I did not see Juliet[te]."

Defendant admitted lying to the police and to the assistant State's Attorney. She told the police five different stories "[b]ecause of fear. I was scared. *** The things that they were saying in there to me ***. You're a cold-blooded murderer and all those things."

In rebuttal, 15-year-old Louis Clayborn testified for the State that on August 29, 1987, he never had a car jack or steel object in his hand, and never struck defendant in the back of the head.

Mrs. Grover testified in rebuttal for the State that there were no guns in her home, that she did not see her son Robert in the crowd

prior to the shooting, and that she did not tell Robert to go home and get a gun.

Linis Kelecius testified in rebuttal that defendant told him she pulled out her gun and that she fired at and hit a light-skinned man who had shot her, but that she hit Juliette instead. Kelecius also took a statement from Cunningham, who never said that someone hit defendant in the head with a jack and in fact said that he never saw anyone hit defendant.

Jack Wilkins testified in rebuttal that he and his partner interviewed defendant at the station. She never said one of the Clayborn brothers shot her. She never said that Louis hit her in the back of the head with a car jack.

Opinion

■■ Defendant contends that the Illinois first degree murder statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—1 *et seq.*) is unconstitutional on due process, equal protection and separation of powers grounds.

We have recently rejected identical arguments, and we follow those decisions here. (See, *e.g., People v. Davis* (1991), 221 Ill. App. 3d 1023, 583 N.E.2d 64 (and citations contained therein); *People v. Newbern* (1991), 219 Ill. App. 3d 333, 579 N.E.2d 583; *People v. Wright* (1991), 218 Ill. App. 3d 764, 578 N.E.2d 1090; *People v. Thomas* (1991), 216 Ill. App. 3d 469, 576 N.E.2d 1020; *People v. Doss* (1991), 214 Ill. App. 3d 1051, 574 N.E.2d 806; *People v. Gore* (1991), 212 Ill. App. 3d 984, 571 N.E.2d 1041.) We hold that the statute under which defendant was convicted is constitutional.

Defendant next contends that her conviction for first degree murder should be reduced to second degree murder because she acted with a "sudden and intense passion resulting from serious provocation." Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(1).

The relevant question on review, when faced with a challenge to the sufficiency of the proof, is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.

Whether a homicide is classified as first or second degree murder is a question for the trier of fact. (*People v. Falconer* (1988), 168 Ill. App. 3d 618, 522 N.E.2d 903.) The burden of proof is on defendant to prove the mitigating factor by a preponderance of the evidence. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(c).) A person commits second degree murder if she kills an individual without lawful justification under a "sudden and intense passion resulting from serious provocation by the

individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed." (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(1).) Serious provocation is defined as "conduct sufficient to excite an intense passion in a reasonable person." Ill. Rev. Stat. 1987, ch. 38, par. 9—2(b).

Defendant maintains that "before she fired any shots during the incident in question, she had been shot, hit in the ribs, the wrist, and the side of the head with a hard metal object." She argues that her testimony was corroborated by the "undeniable evidence of the serious injuries she sustained."

■■ Initially we note that, contrary to defendant's testimony, the stipulated medical evidence does not indicate that defendant's arm was fractured or that the head laceration required stitches. Instead, the stipulated medical evidence merely established that defendant was "treated for a laceration on the back of her head, a bruised left wrist, and a through-and-through gunshot wound on the right side of her body, *** with entry on the right side of [defendant's] back *** and exit wound on the right side of the chest."

Nevertheless, defendant argues that her injuries were sustained in "mutual combat" and were "surely provocation serious enough to reduce an alleged act of first degree murder to one of second degree murder."

Serious provocation may arise from mutual combat. (*People v. Bacon* (1980), 91 Ill. App. 3d 673, 415 N.E.2d 678.) Mutual combat qualifies as serious provocation only if decedent's conduct is serious enough to unleash an intense passion in a reasonable person. (*People v. Pugh* (1989), 187 Ill. App. 3d 860, 543 N.E.2d 875; *People v. Dortch* (1974), 20 Ill. App. 3d 911, 314 N.E.2d 324 (assault by several persons armed with knives is sufficient provocation for shooting one of the people).) Defendant herself testified that she was not angry at Juliette or Veronica. In fact, she did not even see Juliette at the point in time when she fired the gun. Clearly, then, defendant's own testimony destroys her theory that she shot the victims out of intense and sudden passion. See *People v. Tate* (1974), 25 Ill. App. 3d 411, 419, 323 N.E.2d 485, *aff'd* (1976), 63 Ill. 2d 105, 345 N.E.2d 480 (upholding jury's finding that defendant committed murder, not voluntary manslaughter, where defendant testified that she was *not* angry at the time the two victims were shot).

In fact, defendant testified that she fired the gun because she was protecting herself, since she had been shot and there were as many as "50 guns" in the crowd of 25 people.

Defendant does not argue the second mitigating factor which can reduce first degree murder to second degree murder, *i.e.*, if "[a]t the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing" as self-defense, but "his belief is unreasonable." (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(2).) While defendant argued that mitigating theory before the jury, she has abandoned the "unreasonable belief of self-defense" theory before this court. In the 1½ pages of her brief devoted to this issue, defendant argues only that the evidence shows that she acted "under a sudden and intense passion resulting from serious provocation," quoting section 9—2(a)(1) of the statute.

The two mitigating factors require different frames of mind that cannot both be present in the same act. A deliberate act of self-defense would negate inferences of intense passion under provocation. See *People v. Bailey* (1986), 141 Ill. App. 3d 1090, 490 N.E.2d 1334.

Thus, defendant's current second degree murder theory is "inconsistent with the theory she advocated at trial." *People v. Tate*, 25 Ill. App. 3d at 419 (on appeal, defendant argued that she acted under a sudden and intense passion, while at trial she argued that in self-defense, she struggled over a gun, which then accidentally discharged, killing two people).

Moreover, the evidence here showed that defendant instigated the fight. A defendant cannot characterize a fight as "mutual combat" where defendant instigated the fight. (*People v. Bacon* (1980), 91 Ill. App. 3d 673, 415 N.E.2d 678.) Defendant twice crossed the street to approach Juliette and challenge her to fight. Defendant was the first person to make physical contact by repeatedly pushing and shoving Mrs. Grover and Juliette. The jury could also believe the strong and consistent testimony that Juliette repeatedly refused to fight and tried to leave. Even defense witnesses LaTonya and Cunningham testified that Juliette refused to fight and that Juliette never threatened or struck defendant.

The jury could also find credible the testimony of the State's witnesses who heard defendant repeatedly threaten to "kill somebody around here" and who heard defendant specifically threaten to kill Juliette.

The evidence also showed that the "retaliation" by defendant was disproportionate to the provocation, if any. Where the provocation, if any, is slight and retaliation disproportionately great, the crime is first degree murder. (*People v. Dowdell* (1980), 84 Ill. App. 3d 707, 406 N.E.2d 123.) The only evidence tending to indicate that defendant was shot *before* she fired her gun was defendant's own testimony. No

other witness testified that the first shots fired struck defendant, and that she then returned fire. Moreover, when she did fire the gun, she aimed at and shot Veronica, yet she testified that it was Robert who had shot her. Defendant testified she did not see Juliette, Julius or Veronica with any weapons.

Moreover, the jury could well have disbelieved defendant's trial testimony that Robert Clayborn shot her. Defendant's testimony that she did not know who shot her until someone visited her in jail and told her it was Robert lacks credibility, particularly where she never made a visual identification of Robert as the shooter.

Moreover, the jury could reasonably believe that the three victims posed little threat to defendant since Julius was in a full leg cast and on crutches, Juliette was blind in one eye and had vision problems with the other eye, and Veronica was prevented from getting close to defendant by Mrs. Grover, Julius and Cunningham.

Defendant's case was further undermined by the testimony of defense witness Cunningham, who said that defendant did not shoot anyone. This conflicted with defendant's testimony that she shot Veronica. Moreover, Cunningham admitted lying to the police. Defendant testified that she also had lied to the police, giving them five different versions of the incident.

The jury was instructed regarding second degree murder and it did not find in defendant's favor on that issue. It is the province of the trier of fact to weigh the credibility of the witnesses. Here, "where there are numerous variations in the [eyewitnesses'] testimony concerning what occurred, the trier of fact's observation of the demeanor of witnesses is particularly significant." *People v. Tate*, 25 Ill. App. 3d at 419 (eight eyewitnesses to shooting). See also *People v. Irvin* (1969), 115 Ill. App. 2d 332, 252 N.E.2d 764 (abstract of opinion) (issue was for the trier of fact as to whether defendant was provoked to a sudden and intense passion causing him to fire gun at deceased after, during melee in part involving many people, deceased threw bottle at defendant).

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McNULTY, P.J., and LORENZ, J., concur.