THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LUIS RIVERA, Defendant-Appellant.

First District (1st Division)   No. 1—91—0407

Opinion filed September 30, 1993.—Modified on denial of rehearing December 20, 1993.

1016

Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Brian Clauss, and Cory J. Pollack, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Defendant Luis Rivera was charged by indictment No. 89—CR—13493 with the murder of decedent George Faulkner. After a jury trial defendant was convicted of murder (720 ILCS 5/9—1 (West 1992)) and sentenced to 30 years in prison. This appeal followed.

The record reveals that both parties agreed to proceed by stipulation to information contained in the autopsy report as it related to the description and location of wounds on decedent's body. Additionally, defense counsel filed a pretrial motion requesting the court to determine the admissibility of the medical examiner's description of a tattoo that appeared on decedent's body. This information was included as part of the post-mortem report prepared by the medical examiner. Defense counsel asserted that, if admissible, he would also include the presence of the tattoo on decedent's person as part of the stipulation. The court denied defendant's motion and explained that evidence of decedent's gang affiliation could be offered through other testimony. After the denial of defendant's pretrial motion, the following evidence was presented at trial.

Michelle Ariaza testified that about 10 p.m. on June 4, 1989, while in her backyard on Maplewood in Chicago, she heard a commotion coming from the front of her building. She walked to the front of the building, where she saw defendant and his brother Roberto standing on Le Moyne and Maplewood. Ariaza, who was defendant's neighbor, had known him for four months. Ariaza testified that there were also about 10 other black men standing on the street in front of her home.

Ariaza testified that she heard a conversation between defendant and George (George Faulkner, a/k/a Forty Ounce) in which George asked defendant if he could borrow a bicycle, to which defendant replied no. Ariaza testified that George asked defendant why, and defendant replied, "You can't use it you damn nigger." George then asked defendant why he made the racial slur and defendant stated, "If you want to start trouble with me, I'm going to give you trouble." Ariaza testified that defendant then pulled out a knife and stabbed

George in the midsection. George did not have anything in his hands at that time. The two men began fighting for a few seconds, when defendant's brother Roberto came out and asked defendant what was going on, retrieved a bat, and followed after George as he fled toward a construction site on Campbell Street.

Ariaza stated that George was known by the name of "Forty Ounce" and was a member of a street gang, the Maniac Latin Disciples. Ariaza testified that as George ran toward the construction site Roberto ran inside the house, returned with a bat, and chased after George. Ariaza stated that defendant remained behind, showed her the knife he used to stab George, and said "I stabbed the damn nigger."

Ariaza stated that she saw Roberto and George fist fighting again near the construction site. She stated that Roberto hit George over the head with the bat, and George fell to the ground. George stood up and ran as Roberto and defendant chased after him. Ariaza testified that at the time Roberto chased George to the construction site, defendant's brother Elpedio was engaged in a fight with several other men.

Ariaza testified on cross-examination that defendant did not tell George to leave. She stated that she did not remember telling the police that defendant said, "Get out of here, you damn nigger." Ariaza testified that she did not hear George yell to the other men present, "Folks, Folks, [I've] been shot." However, she testified that she did hear George yell something as he ran, but did not recall what he said. This all occurred while defendant's brother Elpedio was fighting with the several other men. Ariaza testified that when George got to the construction site he reached for a metal pipe.

State witness Miguel Rodriguez testified that about 10 p.m. on June 4, 1989, he was watching television with his wife when he heard commotion outside his home. He looked out the window and saw a black man lying on the ground and an Hispanic man hunched over him, hitting and punching the black man in the face. He testified that the Hispanic man stood up with a knife in his hand and said to the black man "[don't] fuck with me nigger." Rodriguez testified that he was about 10 feet away from the men at that time. He saw a second black man with a bat walk across the street and come over to assist the man lying on the ground.

Yolanda Garay testified for the State that on June 4, 1989, about 10 p.m. she was at her home at 1511 North Campbell when she heard noise outside. She looked out of her window and saw a black man and Hispanic man fighting. The black man was lying on the ground. She

stated that she did not know if the black man said anything, but the Hispanic man called the black man a "nigger." At the same time, the Hispanic man continued to hit the black man in the face. Garay stated that she then called the police. On cross-examination Garay testified that she did not know how the fight started.

Michael Conley, a Chicago police officer, testified that on June 4, 1989, he was assigned to a gang mission in the fourteenth district. He went to 1511 Campbell Street, where he observed a black man lying on the ground bleeding from his chest. Conley testified that the area was lighted by a streetlight. Conley stated that he did not recover any weapons in the area. On June 5, 1989, Conley went to a hospital where he arrested defendant and conducted a pat-down search. Conley recovered a fold-down knife from defendant's person. Defendant was taken to Area 5 police headquarters.

Detective Halvorsen testified for the State that on June 4, 1989, he was assigned to investigate a homicide that occurred at 1511 North Campbell Street. Halvorsen identified defendant in court as the person he talked with on June 5, 1989. He testified that defendant was advised of his *Miranda* rights and defendant agreed to make a statement. Detective Halvorsen testified that defendant told him that on June 4, 1989, he was with his brothers Roberto and Elpedio in front of Roberto's apartment when George walked up and asked to borrow a bicycle that was on the sidewalk. Roberto refused to let George use the bicycle and he became angry. Elpedio told George to go away and leave them alone. He stated that George slapped Elpedio in the face. Roberto observed the incident and told George the problem was between Roberto and George. Defendant stated that he felt there was going to be trouble, so he went back to his home, got a knife and came back to Roberto's apartment.

Halvorsen testified that defendant told him that upon returning from Roberto's apartment, he observed Roberto and George fighting. He then approached George and stabbed him. Shortly after that, someone ripped off the defendant's shirt, and George ran east on Maplewood Avenue. Halvorsen stated that defendant yelled at George, "You can't run off, you started this," and with a knife in his hand, chased him. Defendant stated that he chased George to a construction site on Campbell where he tripped and fell to the ground. Defendant stated that at that point he got on top of George and stabbed him several times. Detective Halvorsen stated that defendant told him George said "No, no" as defendant stabbed George. Defendant told George that it was too late and stabbed him a final time. Defendant then went back to his home, where he washed off the knife in the

sink and disposed of his clothes. Defendant told Halvorsen that the knife was still in his home in the kitchen sink.

Halvorsen stated that he requested permission from defendant to go to his home to recover the knife. Defendant consented to a search of the apartment and Halvorsen recovered the knife.

On cross-examination, Halvorsen stated that defendant gave the same statement to him in the presence of the assistant State's Attorney. Halvorsen testified that prior to talking with defendant, he talked with Ariaza. Halvorsen stated that to the best of his recollection, Ariaza told him that defendant said to George after being told he could not use the bicycle to "Just get out of here you damn nigger." After refreshing his recollection by reviewing the police report, Halvorsen testified that Ariaza told him that she saw defendant reach into the side of his pants and take out a large blade knife. Halvorsen stated that he had no independent recollection regarding a statement by Ariaza that someone broke up the fight between Roberto and decedent. However, he did place that statement in his police report. He testified that Ariaza also told him that George yelled out, "Folks, Folks, I've been shot," as he ran toward Maplewood Avenue. Halvorsen did not recall Ariaza telling him that defendant's brother Elpedio and George had a fist fight.

Halvorsen further testified on cross-examination that he talked with Miguel Rodriguez and Yolanda Garay in front of their home on the day of the incident. Their conversations were summarized in the same police report. Halverson stated that he included in his report a statement by Rodriguez that he heard the Hispanic man on the street say "I'm Puerto Rican." Halvorsen testified that there was nothing listed in his notes that made reference to the statement, "Don't fuck with me nigger."

Robert Podlasek testified that on June 6, 1989, he was employed as an assistant State's Attorney with the State's Attorney's office and assigned to Area 5. After advising defendant of his *Miranda* rights, defendant gave a statement regarding the stabbing of decedent. Podlasek testified that a court reporter was present and typed up the statement which defendant gave. After the statement was completed, Podlasek stated that he read the statement to defendant aloud and asked defendant to sign his name. Podlasek said that defendant initialed each page and signed his full name on the last page. In the statement Luis Rivera stated that about 10 p.m. on June 4, 1989, he was at his brother Roberto's home on Le Moyne and Maplewood Avenues. His brother Elpedio was also there. A man by the name of George Faulkner (Forty Ounce) came up to him and

asked Luis for his bicycle. Luis said he told George that the bicycle was at home, and George asked him if he could get it. Luis told George no, then George asked Roberto for the bicycle. Roberto also told George no. George then said that if he was not allowed to borrow the bicycle that he would steal it. Roberto then told George if he was going to steal the bicycle to go ahead. At that point George grabbed the bicycle, and the bicycle fell, and George and Roberto began arguing.

Podlasek stated that defendant told him someone (whom he did not identify) stopped the argument, then George came back and told Roberto if he did not loan him the bicycle, there would be trouble. Elpedio told George to leave Roberto alone, and George questioned Elpedio as to what he was going to do about the situation. At that time, George stated, "In action" three or four times. George then slapped Elpedio in the face and knocked off his glasses. Elpedio swung at George and hit him. Roberto then stood up and told George that he would fight him and the others. Luis stated that he saw several men coming from across the street and thought that they were going to stop the fight. Instead, he was kicked and punched by the men. At that point, Luis pulled out a knife, stabbed George, and George began to run as Luis ran after him. About one block away George fell and Luis stabbed him again. George said, "don't, don't," and defendant told him it was too late and stabbed him a final time. Luis stated that he did not see a weapon in George's hand.

On cross-examination Podlasek stated that Luis never told him that 9 or 10 Disciples came across the street and caused trouble. He stated that he did not ask Luis the names of everyone involved in the fight. Podlasek testified that Luis never said that it was a gang that caused the trouble, so he never asked him about it.

After the presentation of the State's case in chief, the defendant moved for a directed verdict. The court denied that motion. Rosa Rivera then testified on behalf of defendant. Rivera stated that on the night of the incident, she was sitting in the front room of her brother Roberto's home at 1430 North Maplewood Avenue. Shortly thereafter, "Forty Ounce" came up to Roberto and asked to borrow a bicycle. Roberto told "Forty Ounce" no because he had loaned him the bicycle before and "Forty Ounce" did not return it. "Forty Ounce" then said, "There is going to be some trouble," picked up the bicycle and hit Roberto with it. The two then began to fight for less than 10 minutes. Rivera testified that Elpedio and defendant did not join in the fight.

After the fight ended, "Forty Ounce" left and Rosa went home. About 10 minutes later she returned and saw several people running.

She testified that there were about 10 men (whom she identified as Disciple gang members) running with bats and bottles in their hands. She stated that she did not see defendant, Roberto or Elpedio at that time.

On cross-examination Rivera testified that the men she saw running were black and that every one of them had a bat or bottle. She stated that she was on Maplewood, about one-half block away from Le Moyne, when she saw the men running.

Sandra Ramos also testified for the defense. She stated that on the night of the incident she was on the front stairs of her home with her brothers when "Forty Ounce" approached and talked with Roberto. The two men discussed the bicycle and "Forty Ounce" grabbed the bicycle and pushed it towards Roberto. Sandra stated that "Forty Ounce" hit Roberto with the bicycle and the two men fought. Ramos testified that about 10 minutes after the fight, "Forty Ounce" came back with his gang members. The men made gang signs and wore red and black. Sandra testified that there were about 10 men in the gang. She stated that "Forty Ounce" and the 10 men were members of the Disciples street gang. The men were carrying bats and bottles. Sandra testified that the 10 men fell on top of defendant, Roberto and Elpedio, then Roberto and defendant ran south.

On cross-examination Ramos stated that after the fight with "Forty Ounce" and Roberto, "Forty Ounce" went back in the direction of the church on Le Moyne and Maplewood Avenues. There were other gang members standing over there and "Forty Ounce" talked with them. The gang members then began to walk in the direction of defendant, carrying bottles and bats. She stated that Roberto, Elpedio and defendant all ran, and the gang members ran after them, headed towards Le Moyne.

At the conclusion of the evidence, defense counsel tendered to the court jury instructions on self-defense and second degree murder. The court replied that it would only give the instruction as to sudden intense passion. The court refused to give instruction No. 7.06, dealing with self-defense. The court replied that it did not believe there was evidence in the record demonstrating a need for defendant to respond with force. The court also refused to give No. 7.05(a), dealing with the mitigating factor of self-defense.

Defendant first argues that he was not proved guilty beyond a reasonable doubt of first degree murder. Specifically, defendant contends that the evidence presented at trial proved that he had an unreasonable belief that the stabbing of decedent was necessary to pro-

tect himself and others. Defendant maintains that, alternatively, if the conviction is not reversed outright, he should be convicted of the lesser included offense of second degree murder.

When a defendant challenges his conviction based upon the sufficiency of the evidence, the relevant inquiry on appeal is whether the trier of fact, after reviewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453.) The reviewing court is not charged with retrying the case (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267), and the determination of the credibility of witnesses, the weight to be given their testimony and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43, 535 N.E.2d 889.) Any discrepancies in a witness' testimony goes to its weight as evidence and the trier of fact may believe as much or as little of the testimony as it pleases. (*People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260.) Further, a defendant must affirmatively raise the issue of self-defense by presenting some evidence to show that: (1) unlawful force was threatened against defendant; (2) the danger of harm was imminent; (3) defendant was not the aggressor; (4) defendant actually believed that danger existed and that the kind of force used was necessary to avert that danger; and (5) defendant's beliefs were reasonable. (*People v. Zolidis* (1983), 115 Ill. App. 3d 669, 673-74, 450 N.E.2d 1290.) Once facts supporting self-defense are presented, the burden is on the State to disprove the existence of justification beyond a reasonable doubt. *People v. Balfour* (1986), 148 Ill. App. 3d 215, 221, 498 N.E.2d 547.

In the instant case, Rosa Rivera and Sandra Ramos testified on behalf of the defense. Rivera testified that on the night of the incident she observed George and defendant's brother Roberto talking. She stated that George pushed a bicycle into Roberto and the two men fought. The fight lasted for 10 minutes, after which George left and returned with 10 gang members. She testified that defendant and his brothers ran south to escape the gang. Rivera claimed that she did not see defendant with a knife.

Ramos testified that she observed a fight between the decedent and defendant's brother Roberto. She stated that the fight was over a bicycle and lasted about 10 minutes. Ramos testified that defendant was not involved in the fight, and that after the altercation between George and Roberto, she observed 10 gang members with bats and bottles in front of defendant's home.

██ Based on the evidence in the record, the trial court properly found that this evidence did not indicate that: George was the aggressor; the danger of harm was imminent; unlawful force was threatened against defendant; the kind of force used was necessary to avert the danger; and defendant had a reasonable belief. This is particularly true in light of the fact that there was no testimony that decedent had a weapon at any time during the altercation. Thus, absent any evidence supporting self-defense, it was proper for the trial court to find that the burden never shifted to the State to disprove the existence of justification beyond a reasonable doubt.

██ We find that the evidence presented by the State's witnesses supported defendant's conviction of first degree murder. Michelle Ariaza testified that while standing in her backyard she observed defendant and George engaged in a conversation. George asked defendant if he could borrow defendant's bicycle, after which defendant called George a "nigger," pulled out a knife and stabbed him. Ariaza testified that George did not have a weapon in his hand at that time. Ariaza testified that defendant later showed her the knife and told her that he "stabbed the damn nigger."

Miguel Rodriguez testified that he looked from the window of his home and saw George lying on the ground as defendant punched and hit him. Rodriguez also testified that defendant had a knife in his hand and called George a "nigger."

Yolanda Garay testified that she saw the incident from her window. George was lying on the ground, and she heard the defendant call him a "nigger," as defendant continuously hit him in the face.

The evidence presented by the State, although in conflict with that presented by the defense, when viewed in the light most favorable to the State supports defendant's conviction of murder. There was no evidence that George was armed and slight evidence that George was the aggressor. Based on these facts, we find that a rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt.

Defendant contends that, alternatively, this court should reduce his conviction to that of second degree murder because the stabbing occurred at the end of an altercation which he claims was initiated by George. Specifically, defendant asserts that his actions were motivated by an unreasonable belief that the stabbing was justified or that they resulted from George's provocation. A person is guilty of second degree murder if:

> "At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the kill-

ing under the principle stated in Article 7 of the Code, but his belief is unreasonable." 720 ILCS 5/9—2(a)(2) (West 1992).

Article 7 of the Criminal Code of 1961 states:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7—1 (West 1992).

Defendant contends that the facts establish the existence of the statutory mitigating factor that he was acting under an unreasonable belief that the force he used was justified, and that his action resulted from serious provocation.

Defendant cites to *People v. Hudson* (1979), 71 Ill. App. 3d 504, 309 N.E.2d 5, where the appellate court reduced defendant's conviction from murder to voluntary manslaughter. *Hudson* is distinguishable from the instant case. In *Hudson*, there was evidence presented at trial that decedent was armed with a gun at the time he was stabbed by defendant, and that decedent reached for the gun when defendant stabbed him. Additionally, the court in *Hudson* found significant the fact that the fight lasted for five minutes, decedent repeatedly kicked defendant, who was lying on the floor, and had to be pulled away by onlookers. The court also considered the fact that the knife used by decedent was grabbed from a kitchen sink hastily and undeliberately. Those were not the facts in the instant case.

■ Here, there is conflicting evidence that George fought with defendant's brother, after which defendant came outside and observed the altercation. He then went back inside the home and retrieved a knife. This demonstrates that defendant's actions were deliberate and intentional. Further, Michelle Ariaza testified that George asked defendant to borrow his bicycle and that defendant shouted racial slurs. Additionally, Officer Podlasek testified that during his interview with defendant on June 6, 1989, defendant stated George initially asked defendant for the bicycle, and after being told "no," George asked Roberto for the bicycle. He stated that George then threatened to steal the bicycle. This would tend to support the inference that George was not the initial aggressor. On the other hand, defense witnesses testified that George demanded to borrow defendant's bicycle and threatened to steal it if defendant did not cooperate. However,

the jury rejected defendant's version of the facts, and we will not disturb that determination. The trier of fact is entitled to disbelieve defendant's testimony and need not disregard the inferences which flow from other evidence nor search for a "series of potential explanations compatible with innocence, and elevate them to the statue of a reasonable doubt." (*People v. Benedik* (1974), 56 Ill. 2d 306, 309, 307 N.E.2d 382.) Based on these facts, we find that the trial court did not err in determining that defendant did not provide sufficient evidence to reduce his conviction to second degree murder, nor to affirmatively raise the issue of self-defense.

Having reached this determination, we conclude that the burden never shifted to the State to disprove the existence of justification. (See, *e.g., People v. Willis* (1991), 217 Ill. App. 3d 909, 577 N.E.2d 1215.) Thus, defendant's argument that he was not proved guilty of first degree murder beyond a reasonable doubt is without merit.

Defendant also argues that the trial court erred by refusing to give the jury the second degree murder and self-defense instructions. We again find that the evidence presented in the record supports the trial court's determination that defendant was not entitled to either instruction. Our supreme court has found that " 'if there is evidence in the record which, if believed by a jury, would reduce the crime to manslaughter, a manslaughter instruction tendered by defendant must be given.' " (*People v. Johnson* (1991), 215 Ill. App. 3d 713, 727-28, 575 N.E.2d 1247, quoting *People v. Leonard* (1980), 83 Ill. 2d 411, 420-21.) Additionally, the Illinois Supreme Court has recognized mutual combat as serious provocation sufficient to reduce a homicide to second degree murder. (*People v. Healy* (1988), 168 Ill. App. 3d 349, 353, 522 N.E.2d 749.) Courts have defined "mutual combat" as a fight or struggle entered into by both parties willingly or a mutual fight upon a sudden quarrel and in hot blood upon equal terms where death results from the combat. (*People v. Mackey* (1990), 207 Ill. App. 3d 839, 865, 566 N.E.2d 449.) Courts have found that the mutual combat aspect of provocation does not apply where the manner in which the accused retaliated is out of all proportion to the provocation, especially where the homicide is committed with a deadly weapon. *People v. Austin* (1989), 133 Ill. 2d 118, 127, 549 N.E.2d 331.

A trial court's discretion to tender a jury instruction on second degree murder is controlled by clear guidelines: where a defendant has presented some evidence of serious provocation, the trial court must tender the instruction. (*Austin*, 133 Ill. 2d at 124-25.) Only the provocation which the law recognizes as being reasonable and ade-

quate will relieve the slayer from liability for murder. *Mackey*, 207 Ill. App. 3d at 865.

In 1987 the Illinois General Assembly replaced the statutory offense of voluntary manslaughter with the offense of second degree murder. (720 ILCS 5/9—2 (West 1992).) To be convicted of second degree murder a defendant's action must have been motivated by either: (1) a sudden and intense passion resulting from serious provocation; or (2) an actual but unreasonable belief that the circumstances required the use of deadly force as a means of self-defense. 720 ILCS 5/9—2 (West 1992).

■ In reviewing the evidence in the instant case, we find no evidence as to any serious threat that George posed to defendant justifying the use of deadly force. While the defense witnesses opined that it was the alleged presence of 10 gang members that prompted defendant to retrieve a knife and stab George, there are no facts to support such an opinion. The State witnesses testified that defendant was the aggressor, that George was not armed at the time defendant stabbed him, and that defendant was on top of George during the altercation. The trial court pointed out that the evidence supported the theory that defendant was the aggressor and was not acting under an unreasonable belief that deadly force was necessary. Moreover, the evidence in the record does not support defendant's contention that either provocation or mutual combat occurred. Contrary to defendant's assertion, there is no evidence that defendant feared decedent or that he acted under intense passion. Rather, the evidence reveals that he observed an argument and then proceeded, in a cold and calculated manner, to stab the victim, both before and after the victim attempted to flee. Under these circumstances, we cannot say that the trial court erred in failing to instruct the jury on the issue of second degree murder or self-defense.

Defendant further argues that the court erred in failing to allow the medical expert to testify to physical evidence of decedent's gang membership. It is generally held that evidence indicating gang membership or gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. (*People v. Miller* (1981), 98 Ill. App. 3d 453.) Gang-related evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 487, 568 N.E.2d 864.) Relevant evidence is defined as evidence having any tendency to make the existence of a fact that is of consequence more or less probable than it would be without the evidence. (*People v. Williams* (1992), 228

Ill. App. 3d 981, 989, 593 N.E.2d 968.) It is the trial court's function to weigh the probative value of such evidence against its prejudicial effect in determining whether it should be admitted. A trial court's determination of whether evidence is relevant and admissible will not be reversed absent a clear abuse of discretion. (*People v. Nichols* (1992), 235 Ill. App. 3d 499, 506, 601 N.E.2d 1217.) Evidence is relevant which has any tendency to make any fact connected with the case more or less probable. *People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295.

In the instant case, the evidence of George's gang membership was offered through the testimony of Ariaza, Detective Halvorsen and Sandra Ramos. The fact that decedent had gang insignia on his body would not have proved any disputed fact. Defendant maintains that the existence of the tattoo on George's person would have proved defendant's state of mind at the time and that he had a reasonable belief that George had a violent reputation.

This argument is speculative and unpersuasive. In light of the fact that decedent's gang membership was placed before the jury through the testimony of other witnesses, the trial court did not err in excluding this testimony from the medical examiner. See, *e.g., People v. Patterson* (1993), 154 Ill. 2d 414, 458, 610 N.E.2d 16.

Defendant's final argument is that the Illinois murder statute is unconstitutional on due process and equal protection and separation of power grounds. This court addressed and rejected identical arguments in *People v. Banks* (1992), 227 Ill. App. 3d 462, 592 N.E.2d 107. We choose to follow this well-reasoned decision.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.